[Civ. No. 21498. First Dist., Div. Two. Sept. 21, 1964.]

COUNTY OF CONTRA COSTA, Plaintiff and Respondent, v. SOCIAL WELFARE BOARD et al., Defendants and Appellants; CASSANDRA JEAN HENDERSON, a Minor, etc., et al., Real Parties in Interest.

Stanley Mosk, Attorney General, Elizabeth Palmer, Deputy Attorney General, and Rudolf H. Michaels for Defendants and Appellants.

George Franklyn Duke and Marshall W. Krause as Amici Curiae on behalf of Defendants and Appellants.

John A. Nejedly, District Attorney, and Verne H. Pynn, Deputy District Attorney, for Plaintiff and Respondent.

No appearance for Real Parties in Interest.

AGEE, J.—The Social Welfare Board of the State of California again appeals from a judgment ordering it to set aside its decision that the County of Contra Costa should reinstate the Aid to Needy Children (ANC) grant of Eula L. Henderson for the benefit of her child, Cassandra.

The previous judgment in favor of the county was reversed on appeal and the superior court was instructed that its function herein was limited to a determination of whether the findings of the board are supported by substantial evidence in the light of the whole record, as required by section 1094.5 of the Code of Civil Procedure. (*County of Contra Costa* v. *Social Welfare Board,* 199 Cal.App.2d 468 [18 Cal. Rptr. 573].)

The matter was resubmitted to the superior court upon the same record and it has now included in the present judgment a statement that the board's findings "lack substantial evidentiary support."

The determinative issue on this appeal is whether there is substantial evidence to support the board's finding that the mother (Eula) "has cooperated to the best of her ability in identifying the father of Cassandra."

The following background is excerpted from our prior opinion. "Eula applied to the Social Welfare Department of the county for a grant of assistance on behalf of her daughter Cassandra, and a grant was made by the county. About 15 months after the grant, the county terminated aid insofar as Cassandra was concerned on the ground that Eula had failed to identify the father of Cassandra. The district attorney's office of the county requested that Eula submit to a polygraph examination (commonly called a 'lie detector test') to aid in determining the natural paternity of Cassandra. Eula refused, and appealed the county's discontinuance of aid to the board. This appeal is provided for by Welfare and Institutions Code section 104.1. [Pertinent provisions now in § 445.] Hearings were held before a referee of the board and the referee prepared a proposed decision which was later adopted by the board. The decision was that Eula should continue to receive aid for Cassandra and that Eula had cooperated to the best of her ability in identifying the father of Cassandra. From the evidence before him the referee also concluded that Eula's refusal to submit to the polygraph examination did not constitute a refusal to offer reasonable assistance to law enforcement officers, as

required by section 1523[1] of the Welfare and Institutions Code.''

The specific problem before us is whether, *as a matter of law*, Eula's refusal to submit to a polygraph examination constitutes a refusal of ''reasonable assistance'' in determining the identity of the father of Cassandra. If it does not, the board's finding as to cooperation must be upheld.

The record shows that Eula has consistently identified one William C. Roberts as the father. However, the county questions her credibility. It points out nine ''untruths and evasions'' by her with respect to an automobile registered in her name, the presence of men other than Roberts in her home, and the withholding of information concerning a previous illegitimate child.

The county's contention is that it was justified in doubting Eula's veracity and that its purpose in demanding a lie detector test was to obtain ''reasonable assistance'' in clearing up the question of Cassandra's parentage.

In March 1958 Eula informed a county welfare worker that she was expecting her sixth child in August, that William C. Roberts, 1517 Adeline Street, Oakland, was the father, and that he was employed at the Ford plant.

Roberts telephoned the worker on March 27, 1958, ''to state that he cannot say what he will be able to do for Mrs. Henderson and the unborn child because he is faced with the loss of employment.''

On the same day Eula reported to the county worker that she could not reach any understanding with Roberts with

---

[1]This section is now numbered 1572; it provides as follows: ''Any child, who is otherwise qualified to receive a grant or payments for aid under this chapter by reason of the continued absence of one of such child's parents from the home and who is residing with, or is in the custody or control of the other parent, shall be disqualified from receiving such grant or payments for so long as the parent, who has such custody and control or with whom such child resides, refuses law enforcement officers charged with the duty or right of enforcing the obligation of such absent parent for the care, support and maintenance of such child under and by virtue of the penal laws of the State of California, reasonable assistance in the enforcement of such obligation.

''Any one or more of the following acts by the parent having custody of the child shall be deemed to be a refusal to offer reasonable assistance to law enforcement officers: (a) A refusal to be interviewed by the district attorney. (b) A refusal to sign a complaint against the absent parent. (c) A request to dismiss the complaint. (d) The concealment of the identity or whereabouts of the absent parent.''

respect to child support. She went by appointment to the district attorney's office and signed a complaint form against Roberts to enforce the payment of such support.

On April 9, 1958, Roberts appeared at the district attorney's office in response to a citation. He stated that he had started going with Eula around November 1957 and had had sexual intercourse with her three or four times after that. He did not deny parentage at that time. He took the position that maybe he was the father and maybe one Hartwell was.

On April 23, 1958, Hartwell was cited into the district attorney's office. He stated that he and Eula had broken up around September 1957, and that he had not had sexual relations with her during the period of conception. He denied that he could be the father.

On November 24, 1958, a paternity blood test was completed on Roberts, Eula and Cassandra. This test established that Roberts could be, but was not necessarily, the father. Hartwell's offer to submit to a similar test was not accepted by the district attorney.

On December 1, 1958, Roberts was again cited into the district attorney's office. He stated that Hartwell was still going with Eula and that Hartwell had never broken up with her.

An entry in the district attorney's records, made on December 8, 1958, states that "there is strong evidence that the complaining witness, Mrs. Henderson, was spreading her affection among several other men" and that prosecution of Roberts was not feasible because "we could not prove beyond a reasonable doubt that he is the father."

On October 26, 1959, Eula's mother complained to the police that Hartwell had been molesting Eula's two oldest girls and that he had been living at the home. This resulted in a reopening of the county's investigation as to the identity of Cassandra's father, with Hartwell as the suspect.

Aid for Cassandra was terminated as of November 1, 1959. Thereafter, a county worker went to Eula's home and asked her if she would take a lie detector test. Eula consented to do so but added that she intended to see her attorney.

The district attorney thereupon arranged for the test to be given on December 2, 1959. However, Eula then withdrew her consent on the advice of her attorney.

The hearings in this matter were held on January 8, 1960, and January 22, 1960. Eula testified in detail, as did Hartwell.

Eula again named Roberts as the father and Hartwell denied being the father. Roberts did not appear.

The findings adopted by the board state that the conclusion that Eula "has cooperated to the best of her ability in identifying the father of Cassandra" is based upon the following: "1. The appellant has declared consistently that Mr. Roberts is the father of this child. 2. Mr. Roberts admitted to sexual relations with the appellant during the period of Cassandra's conception. 3. It appears that Mr. Roberts himself had initially accepted the fact that he had fathered the child. 4. His categorical denial of paternity apparently came several months later following efforts on the part of law enforcement officers to enforce support and could be interpreted as self-serving. 5. The paternity test taken subsequent to the birth of Cassandra does not exclude Mr. Roberts as the child's father. 6. Mr. Hartwell has consistently denied that he could be Cassandra's father."

The county expressly concedes "that to force every individual welfare applicant or recipient to undergo a polygraph examination as a condition of present or continued eligibility would be improper."

The county further acknowledges that it is bound by the finding of the board as to an applicant's cooperation with law enforcement officers *unless* such finding is "not undergirded by substantial evidence."

We have concluded that the board's finding as to Eula's cooperation is supported by substantial evidence and that her refusal to submit to a polygraph examination is not inconsistent with or contrary to such finding.

The judgment is reversed and the lower court is directed to enter judgment denying the peremptory writ of mandate.

Shoemaker, P. J., concurred.