STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JUNE CLARK AND CHARLES BARR, DEFENDANTS-APPELLANTS.

Argued December 8, 1970—Decided March 22, 1971.

*Mr. Edward Goldberg* argued the cause for appellant June Clark.

*Mr. David M. Hoffman* argued the cause for appellant Charles Barr (*Messrs. Eckhaus, Guston & Hoffman*, attorneys).

*Mr. Archibald Kreiger,* Assistant Prosecutor, argued the cause for respondent (*Mr. Joseph D. J. Gourley,* Passaic County Prosecutor, attorney).

The opinion of the Court was delivered by

FRANCIS, J. Defendants June Clark and Charles Barr were indicted and convicted after a jury trial on three charges of fornication. Miss Clark received a six months jail sentence which was suspended and she was put on probation for two years. Barr was sentenced to a total of three months imprisonment. The Appellate Division affirmed the convictions, *State v. Barr,* 110 *N. J. Super.* 365 (App. Div.), and we granted certification. 57 *N. J.* 132 (1970).

It is a matter of common knowledge that in these times criminal prosecutions for fornication are rare. The statute, *N. J. S. A.* 2A:110-1, which makes the act a misdemeanor punishable by a fine of not more than $50 or by imprisonment for not more than six months, or both, was included in our Crimes Act in 1796. *Paterson's Laws* 210 (1800 ed.).[1] The paucity of its use is indicated to some extent

[1]"That every person who shall commit fornication, and be thereof convicted, shall be punished by the fine of fourteen dollars, to be paid to the overseers of the poor of the township where the offense was committed, for the use of the poor of the said township." *An Act for the Punishment of Crimes, L.* 1796, § XV. Under an earlier statute, fornication in New Jersey was not indictable unless it was followed by birth of a child. *Smith v. Minor,* 1 *N. J. L.* 16, 19, 25

by the fact that since the 1908 decision in *State v. Sharp,* cited in footnote 1, there seem to be only two other appellate cases arising from a fornication prosecution in our law reports, *i. e., State v. Ruttberg,* 87 *N. J. L.* 5 (Sup. Ct. 1915) and *State v. Lutz,* 57 *N. J.* 314 (1971), until the present appeal. However, we cannot accept the suggestions that the statute ought to be regarded as such a relic of ancient times, so out of tune with presently existing notions of morality, so discriminatorily administered, and so invasive of a protected zone of privacy as to require a holding that a person accused under it is denied equal protection and due process contrary to the Federal Constitution. In the absence of a factual record to show discrimination (and none is presented here), such arguments are primarily matters for legislative and not for judicial consideration. *State v. Lutz, supra; State v. Barr, supra,* 110 *N. J. Super.* at 368–369.[2]

The circumstances out of which the indictments arose in this case are unusual and must be set forth for an understanding of the issues involved.

In July 1965, June Clark, being destitute, unmarried and the mother of two sons, one two years of age and the other three months old, applied to the Department of Welfare of the City of Paterson for financial aid. According to Miss Clark, after discussion of the matter with a repre-

---

(Sup. Ct. 1790). *Wharton* notes that at common law fornication was not a criminal offense when committed in private. 2 *Wharton, Criminal Law and Procedure,* § 676, p. 476 (Anderson ed. 1957) ; *State v. Baldino,* 11 *N. J. Super.* 158, 161 (App. Div. 1951). *Cf. State v. Sharp,* 75 *N. J. L.* 201 (Sup. Ct. 1907), *aff'd o. b.* 76 *N. J. L.* 576 (E. & A. 1908), which held that upon adoption of the 1796 Act, birth of issue was no longer an element of the offense.

[2]The drafters of the Model Penal Code noted that as of 1955, 11 of the then 48 states had no fornication statutes and only 18 punished a single act of intercourse between unmarried persons (four of these by fine alone). *Model Penal Code,* § 207.1, Comment at 204 (Tentative Draft No. 4, 1955). The Advisory Committee of the American Law Institute in preparing the tentative draft of the Model Penal Code removed private fornication entirely from the area of criminality, suggesting that such matters were best left to religious, educational or other social influences. *Id.* at 207.

sentative of the agency, she was told that before she could receive welfare benefits it would be necessary to file a bastardy complaint against Charles Barr who, she claimed, was the father of the children. In accordance with that direction, on July 7, 1965 she filed such a complaint against Barr in the Municipal Court of the City of Paterson.

Bastardy proceedings against the putative father may be instituted either by the mother of an illegitimate child or, if the child is likely to become a public charge, by the director of welfare of the municipality. *N. J. S. A.* 9:16–3, 9:17–2. It appears to be a common practice of municipal welfare departments throughout the State to request the mother of an illegitimate child who seeks public financial aid to bring a bastardy action against the putative father. (Obviously if she refused to do so, on its own motion the department may file the complaint in the name of the director of welfare. *N. J. S. A.* 9:17–2.) The purpose of the action is to establish paternity and to obtain an order of the court commanding the father to provide regular support for his child or children, thus relieving the public of that financial burden.

Although Miss Clark testified, without denial, that the welfare department ordered her to file the bastardy complaint against Barr as a condition to obtaining financial help for herself and her children, it is to be noted that under the statute initiation of such proceedings is not to be deemed "a condition precedent nor a deterrent to the granting of assistance or relief" to a person eligible therefor. *N. J. S. A.* 9:17–2. It is not necessary for this Court to consider the question whether Miss Clark was requested or ordered to file the bastardy complaint. No such issue is before us. The interest of welfare departments in having paternity proceedings brought in order to have the public relieved of the burden of support if possible, is understandable, and it is proper for them to seek that objective. We assume, however, that in such cases the needed financial aid is not withheld either from a mother who refuses to bring such an action, or

during the pendency of the proceeding, whether instituted by the mother or the department itself. To do so would be contrary to the clear language of the statute.

██ Bastardy is not a crime in New Jersey. A proceeding against a putative father is essentially a civil, not a criminal one. As indicated above, the primary objective is to compel the father who begot the illegitimate child to assume the duty of supporting it and secondarily to relieve the public of that obligation. *State (F.) v. M., 96 N. J. Super.* 335, 340–342 (App. Div.), *certif. den.* 50 *N. J.* 300 (1967); *Leconey c. Overseer of Poor,* 43 *N. J. L.* 406 (Sup. Ct. 1881). An adverse verdict on the issue of paternity does not establish a criminal record against the father.

Although bastardy is not a criminal offense, fornication is a crime. *N. J. S. A.* 2A:110–1. But as the prosecutor informs us, and as we may take notice, a criminal prosecution for fornication stemming from a bastardy proceeding is extremely rare. We may assume that once the paramount public purpose has been served by a paternity judgment and by a support order against the father, there has been little incentive for any criminal action for fornication — at least as long as the adjudicated obligation to support is faithfully met. Moreover, both welfare authorities and criminal law enforcement agencies know that the most effective remedy for willful failure to comply with the support order is recourse to the contempt power which is designed to enforce continuing obedience by means of the imposition of substantial civil and criminal sanctions, if necessary.

It is unlikely that either the ordinary female whose necessitious circumstances impel her to seek welfare aid for her illegitimate children, or the putative father who is then brought into a civil bastardy proceeding by what the female believes is a command that she cannot ignore, realizes the incriminatory nature of the statements they make or are called upon to make. Obviously in most situations, the female, without thinking about it at all, admits the crime of fornication.

So, too, with the responsible male who, in many cases, quite freely acknowledges paternity and agrees before the municipal court to submit to an order for support. He does not think in terms of criminal inculpation. Unless both of them are represented by counsel, it seems most unlikely that in the ordinary case anyone connected with the welfare agency or the court would advise them of their possible exposure to criminal prosecution. The pertinent statute itself furnishes a clear indication of such unlikelihood. N. J. S. A. 9:17–11 provides that "upon the examination or trial [of a bastardy complaint], * * * the mother of the illegitimate child may be compelled to disclose the name of its father, and if she refuses the court * * * may * * * commit her for contempt * * *." As a consequence welfare representatives believing that the mother is compelled to name the father might well conclude that they are relieved of any duty to warn her about possible self-incrimination. However, there is no provision in either N. J. S. A. 9:16–1 et seq. or N. J. S. A. 9:17–1 et seq. which grants immunity from criminal prosecution for fornication to the mother for any inculpatory admission she makes whether the admission is compelled or made in ignorance of its possible consequences.

In this case when Miss Clark sought financial aid, the bastardy complaint reveals that she gave a written statement to the welfare board admitting voluntary sexual relations with Barr and naming him as the father of her two children. No one gave her any advice on the subject of self-incrimination. See Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The complaint, which was drawn pursuant to N. J. S. A. 9:16–3, alleged that June Clark had declared in writing that she had been delivered of two illegitimate children who were likely to become public charges of the City of Paterson. It further set forth that she had declared that Charles Barr, as a result of her sexual intercourse with him, was the putative father of the children. She swore to the complaint before the municipal court clerk

who likewise offered no information about her Fifth Amendment rights.[3]

When the case came on for hearing on August 6, 1965, Miss Clark and Barr appeared without counsel. There was no trial in the formal sense and no one, including the judge, gave them any advice about self-incrimination. Miss Clark by her sworn statement in the complaint had admitted sexual relations with Barr and the resulting birth of two illegitimate children. Barr freely admitted the intercourse, paternity of the children and his obligation to support them. The court entered his plea of guilty on the record and ordered Barr to pay $15 weekly, beginning August 7, 1965, for the support of each child. In the trial of the subsequent fornication indictment, now on appeal, on being asked why he pleaded guilty in the bastardy proceedings, he said:

[3]It is usual practice for state or local welfare boards to engage in serious efforts to have paternity established and to secure support orders where the needy children are born out of wedlock. See *Mc-Keany, The Absent Father and Public Policy in the Program of Aid to Dependent Children* 54, 84–87 (Univ. Cal. Press, 1960). For example, the federal statute providing for grants to states for aid and services to needy families with children demands that the state agency will undertake "in the case of a child born out of wedlock, who is receiving aid to families with dependent children, to establish the paternity of such child and secure support for him." 42 *U. S. C. A.* § 602(a)(17)(A)(i) ; *King v. Smith*, 392 *U. S.* 309, 88 *S. Ct.* 2128, 2140, 330, 20 *L. Ed.* 2d 1118, 1133 (1968). However, the agency is required to "provide safeguards which restrict the use or disclosure of information concerning applicants and recipients to purposes directly connected with the administration of aid to families with dependent children." 42 *U. S. C. A.* § 602(a)(9). This restriction has been applied strictly and use of the information is permitted only for purposes directly connected with administration of the welfare program. See *In re Cager*, 251 *Md.* 473, 248 *A.* 2d 384 (1968) ; *Mace v. Jung*, 386 *P.* 2d 579 (Alaska Sup. Ct. 1963). Every state, including New Jersey, participates in the Federal Government's Aid to Families with Dependent Children Program (AFDC). *King v. Smith, supra*, 392 *U. S.* 309, 88 *S. Ct.* 2128, 20 *L. Ed.* 2d 1118.

The California Welfare and Institutions Code, § 11477 provides that a dependent child shall be disqualified for benefits so long as the mother refuses reasonable assistance to law officers in the enforcement of the putative father's obligation of support. Such conduct may be refusal to sign a complaint or concealment of identity of the

"Because I did have relations with Miss Clark and I did feel obligated and I had made it known to Judge Alfano at the time that this was the reason I would pay, to avoid going through what I am going through right now."

Some time prior to August 24, 1967, two years after the support order was entered, apparently Miss Clark reported to the welfare authorities that Barr had defaulted in his weekly payments to the extent of $240. Thereafter, the Municipal Court of the City of Paterson summoned him to show cause respecting the arrearages. There was no doubt about the default but Barr's explanation was that he had suffered injury in a fall from a roof while working as a painter and that he had been out of work for almost two months. He said also that when he had funds he tried to "catch up" on the arrears.

In response to the summons, the parties appeared in the municipal court on September 1, 1967, at which time the judge learned from Miss Clark that she and Barr had three illegitimate children and that she was pregnant again by Barr. The judge directed that a complaint charging fornication be made against them. There was no warning about Fifth Amendment rights until after the court turned Barr and Miss Clark over to a police officer for questioning.

father. In that connection the District Court of Appeal held that, where there was other evidence of cooperation the mother's refusal to take a polygraph test did not of itself constitute a refusal of reasonable assistance. *County of Contra Costa v. Social Welfare Board*, 229 *Cal. App.* 2d 762, 40 *Cal. Rptr.* 605 (Dist. Ct. App. 1964). Although the California statute imposes a more severe obligation on the mother to pursue the putative father, it must be noted that fornication does not constitute a crime in that state. *In re Lane*, 58 *Cal.* 2d 99, 22 *Cal. Rptr.* 857, 860, 372 *P.* 2d 897, 900 (1962) ; *People v. Allison*, 25 *Cap. App.* 746, 145 *P.* 539 (Dist. Ct. App. 1914), *overruled on other grounds People v. Munoz*, 61 *Cal. App.* 2d 646, 143 *P.* 2d 502 (Dist. Ct. App. 1943). Moreover, section 11478 of the California Code provides that information given by the mother of an illegitimate child about her relations with the putative father is "confidential" and can be used only for the purpose of enforcing support liability. Criminal liability arises if the father fails to comply with a court support order. *Cal. Penal Code* § 270.

Shortly thereafter, the Grand Jury returned the three count indictment charging both defendants with the crime of fornication on three dates which represented the approximate conception dates of the children.

The criminal trial resulted in the convictions of both Miss Clark and Barr which are the subject of this appeal. At the outset of the trial, the State put in evidence against them the 1965 bastardy complaint against Barr, which had been signed and sworn to by Miss Clark. The State also proved Barr's plea of guilty to that complaint which, of course, established his paternity of the two children named therein as well as his admission of fornication. In fact, the trial judge, by his questions, mistakenly obtained an admission from Barr that the 1965 complaint to which he had pleaded guilty charged him with fathering three children, rather than the two actually mentioned therein. At any rate, when called to the witness stand both Miss Clark and Barr admitted without hestitation having had sexual relations with each other on the dates mentioned in the indictments.

In charging the jury, the trial judge defined the crime of fornication and in his discussion of the facts recited that the defendants had conceded having engaged in sexual intercourse on the dates set out in the indictment. Then he instructed the jury to decide whether the State had proved their guilt of fornication beyond a reasonable doubt. On the record before him, and the then apparently existing state of the law, it would have been difficult for him to have done otherwise. It is likewise plain that, from a jury standpoint, a verdict other than one of guilt was extremely remote.

On this appeal, defendants urge as principal grounds for reversal:

■ (1) That *N. J. S. A.* 2A:110–1 is invalid because it unjustifiably interferes with their right of privacy which is protected by the due process clause of the Fourteenth Amendment of the United States Constitution. Support for

this contention is allegedly provided by *Griswold v. Connecticut,* 381 *U. S.* 479, 85 *S. Ct.* 1678, 14 *L. Ed.* 2d 510 (1965). We have recently rejected that contention and find no need for further discussion of it. *State v. Lutz, supra,* 57 *N. J.* at 315.

(2) That defendants' Fifth Amendment rights were violated because (a) the various representatives of the welfare and police authorities failed to advise them of such rights in the initial stages of the welfare, bastardy and police court proceedings, and (b) because defendant June Clark was required to incriminate herself as a condition of the receipt of welfare benefits for herself and her necessitous children.

 We agree that the Fifth Amendment implications involved, in association with strong considerations of public policy, require reversal of the judgments of conviction of fornication.

 The common law imposed no obligation on a father to support his illegitimate child. *Hall v. Centolanza,* 28 *N. J. Super.* 391, 394 (App. Div. 1953). The duty to provide support and education for such a child was imposed by statute upon the father as well as the mother. *N. J. S. A.* 9:16-1 *et seq.,* and 9:17-1 *et seq.* However, a determination of paternity and an order of filiation were required as conditions precedent to an order for maintenance. *Borawick v. Barba,* 7 *N. J.* 393, 396 (1951); *Layton v. Cooper,* 2 *N. J. L.* 61 (Sup. Ct. 1806).

Originally, only the overseer of the poor was authorized to institute bastardy proceedings against a putative father of an illegitimate child, and then only when it appeared that the child was or was likely to become a public charge. *Hall v. Centolanza, supra,* 28 *N. J. Super.* at 394. But in 1929 the Legislature empowered the mother as well as the welfare agency involved to bring the action, both to determine paternity and to enforce the father's support obligation. *L.* 1929, *c.* 153; *N. J. S. A.* 9:16-3; *Hall v. Centolanza, supra,* 28 *N. J. Super.* at 394-395.

Of course, if the mother did not activate the bastardy proceeding, or if it did not come to the welfare agency's attention that the child was likely to become a public charge, the father would escape the burden of maintenance, unless he assumed it voluntarily. But, unless the mother was willing to admit that she had engaged in voluntary sexual relations which caused her pregnancy and to identify the putative father, the welfare department's action might be futile. Undoubtedly, realization of that possibility motivated the Legislature to provide that upon the examination of the mother or upon the trial of the bastardy case, the court could compel the mother to disclose the name of the father. *N. J. S. A.* 9 :17–11. And, probably in reliance upon that statute, as we have already noticed, the practice grew up in cases where the mother sought welfare aid for her illegitimate child to require her to bring the action in her own name, as a condition of the granting of such relief. But, there is no requirement in the statute nor, so far as we have been advised, in the regulations of the public welfare agencies for the giving of warnings about possible self-incrimination to the mother or to a putative father who is willing to acknowledge paternity and accept a support order. Nor does this statutory regulation grant any form of immunity against criminal prosecution for fornication which may arise from unwitting or compelled inculpatory admissions during the proceedings. *Cf. New Jersey Rules of Evidence, Rules* 38, 40.

As noted above, the statutes referred to were not enacted to punish the person determined to be the father of the illegitimate child. State (*F.*) *v. M., supra,* 96 *N. J. Super.* at 341. The paramount legislative policy was to require those responsible for the child's existence, *i. e.,* father as well as mother, to furnish support. The intention was to upgrade the status of out of wedlock children by giving them the same right to support and education from their father and mother as if they were born in lawful wedlock. *N. J. S. A.* 9 :16–2. Over the years, legislative and judicial actions have shown an increasing design to reverse the ancient

order under which such children were constantly reminded that they were non-persons and, so, properly the subject of discriminatory exclusions. See generally, Diamond, "The Children of Leviathan: Psychoanalytic Speculations Concerning Welfare Law and Punitive Sanctions," 54 *Cal. L. Rev.* 357 (1966); *Levy v. Louisiana,* 391 *U. S.* 68, 88 *S. Ct.* 1509, 20 *L. Ed.* 2d 436 (1968); *Schmoll v. Creecy,* 54 *N. J.* 194, 203 (1969); *In re Estate of Calogero,* 51 *N. J.* 345 (1968); *In re Estate of Spano,* 49 *N. J.* 263 (1967); *Hammond v. Pennsylvania R. R. Co.,* 31 *N. J.* 244 (1959); *Kopak v. Polzer,* 4 *N. J.* 327 (1950).

A basic purpose of all state and federal welfare programs is to provide financial aid for dependent impoverished children, whether legitimate or illegitimate, when the parents (particularly the father who is regarded generally as the breadwinner) are unable to maintain them. In pursuit of that objective where out of wedlock children are concerned, both federal and state programs plainly aim at inducing the father to assume the burden of support, if he is able to do so. That is the reason for the pressure on the mother to institute bastardy proceedings to establish paternity and to obtain a maintenance order. But there is no mandate which requires the mother or putative father to incriminate themselves as to the crime of fornication in connection with their appeal for aid for the child or children, or which relieves the public agency and the municipal court of the obligation to warn of possible criminal prosecution for fornication when information is sought as to the relationship of the parties, or which requires a waiver of the constitutional right of the mother or putative father to freedom from involuntary self-incrimination. And as far as an alleged waiver of Fifth Amendment rights is concerned, particularly by the mother, it must be recognized that the extremity of her circumstances, arising from the children's need, makes intimidation and duress fairly implicit in the situation. The circumstances of the children's plight may well be such as to make any claim of voluntary waiver by the mother a dubious one. The pov-

erty of the children may be intense and their dependence on public assistance absolute. The mother has to be conscious that if the children are not to be allowed on the public assistance rolls, they have no means of support. It must be realized that, in present day concepts, welfare programs are not geared so much to the police power as to the general welfare power. Thus, the State's burden of showing a free and intelligent waiver of constitutional and statutory rights must be considered a heavy one.

We think it plain that the legislative aim, both state and federal, is to accomplish a civil objective not a criminal prosecution. That objective is to require the mother in the ordinary case involving illegitimate children to bring the civil action to establish paternity and obtain a support order against the father, thus relieving the public of the burden. There can be no doubt that the paramount public policy to be served is achievement of a support order against the father. It was not the design of the legislation to obtain information from the mother or father on which criminal prosecution for the crime of fornication would be predicated, in whole or in part. This is indicated on the federal scene by 42 *U. S. C. A.* § 602(a)(9), which is applicable to states receiving grants in aid under that program, and which requires each state to provide safeguards restricting the use or disclosure of information concerning applicants and recipients to purposes directly connected with the administration of aid to families with dependent children. See *In re Cager, supra,* 248 *A.* 2d at 389. At the State level the bastardy statute itself provides a similar indication. Since the mother may be compelled thereby to disclose the name of the man with whom she had the voluntary intercourse which produced the illegitimate child, *N. J. S. A.* 9:17–11, it seems unlikely that criminal prosecution for fornication based in whole or in part upon such admissions was considered possible. See *New Jersey Rules of Evidence, Rules* 24 and 25, and *compare In re Vince,* 2 *N. J.* 443, 450–451 (1949) where *R. S.* 2:105–2 was construed broadly (prior to the amendment to

its present form, *N. J. S. A.* 2A:87–2) so as to provide immunity for a woman who was compelled to testify before the grand jury about her pregnancy and the consent abortion committed upon her.

If a destitute mother who seeks welfare aid for her illegitimate child is pressured into bringing a bastardy proceeding and compelled under pain of a contempt order to name the male partner in the sexual intimacy, and if the information she gives (as well as that of the unwarned putative father who acknowledges paternity during the investigation or at the trial of the bastardy case) may be later used as a basis for indictment for fornication against her or both of them, what may be expected as the probable result? The strong probability is that such criminal prosecution will have a "chilling" effect on applications for aid for impoverished out of wedlock children. The likelihood is that mothers will forego such relief rather than incur the risk of a criminal trial, conviction and possible imprisonment of herself and her paramour. In fact, on oral argument of this appeal, the prosecutor frankly conceded that since the criminal complaint charging fornication was made against these defendants, there had been a falling off in the number of applications by mothers of illegitimate children for relief.

If the threat of criminal prosecution results in the mother withholding her plea for welfare aid, who are the sufferers? Obviously the innocent children who are punished for the moral laxity of their parents. Thus society forces a continuance of their impoverishment upon them in order to make possible imposition of criminal sanctions upon their erring mothers and fathers. Such a course in effect denies to needy illegitimate children the benefit which it grants to needy legitimate children. It makes the test for aid the morality of the parents and, consequently, subverts the true statutory test, i. e., the impoverished condition of all children without regard to status.

The law should not allow constitutional rights of the parents to be sacrificed as a condition to gaining public assistance

for the children. Penal intrusions of the kind involved here into the law of welfare must be considered restrained by the Fifth Amendment and by our rules of evidence. *New Jersey Rules of Evidence, Rules* 38, 40. Emphasis is given this view by the statute itself which, as noted above, ordains that institution of bastardy proceedings "shall in no wise be deemed a condition precedent * * * to the granting of assistance or relief under any law of this State * * *" to eligible needy children. *N. J. S. A.* 9:17–2. It must be said also that except in unusual circumstances not present here, criminal prosecution of the parents for fornication cannot be deemed to serve and perpetuate the best interests of the children, but rather to impermissibly use the innocent children as pawns in a design to punish the parents, the mother particularly, for past moral aberrations and to discourage other women of like weaknesses and inclinations from further pregnancies. *In re Cager, supra,* 248 *A.* 2d at 389. The preventive goal as to the mother may be a desirable one, but if its pursuit visits continued destitution upon the children, it is opposed to the aims of both federal and state welfare programs. See Handler, "Controlling Official Behavior in Welfare Administration," 54 *Cal. L. Rev.* 479, 504 (1966). Society's interests in its future citizens are not protected when children grow up in need. *McKeany, The Absent Father and Public Policy in the Program of Aid to Dependent Children, supra,* at 64.

The transcendent importance of the Federal Aid to Families with Dependent Children program was revealed by the United States Supreme Court recently in *King v. Smith, supra,* 392 *U. S.* 309, 88 *S. Ct.* 2128, 20 *L. Ed.* 2d 1118. There Alabama, which participates in the program, adopted a so-called "substitute father" regulation which denied welfare payments contemplated by the federal act to all of the children of a mother who cohabited in or outside the home with any single or able-bodied man. It was immaterial whether the substitute father was actually the father of the children. It was also irrelevant whether he was legally ob-

ligated to support the children and whether he did in fact contribute to their support. In two and one-half years after the regulation became effective, the number of children recipients of aid declined by about 16,000, about 22% of the total such recipients in the state. 392 *U. S.* at 315, 88 *S. Ct.* at 2132, 20 *L. Ed.* 2d at 1124.

The court pointed out that the AFDC program is based upon a scheme of cooperative federalism. It is financed largely by the Federal Government on a matching fund basis and is administered by the states. (New Jersey is a participant in the program.) Those states which wish to participate must do so according to a plan submitted to and approved by the Secretary of Health, Education and Welfare. If the plan is not approved federal funds will not be made available. Under the federal program a needy child qualifies for aid if he is under 18 years of age or a student under 21 years, if he has been deprived of parental support or care by reason of the continual absence from the home of a parent, and if he is living with any one of several listed relatives. 392 *U. S.* at 313, 88 *S. Ct.* at 2131, 20 *L. Ed.* 2d at 1123. Alabama considered that a man who qualified as a "substitute father" under its regulation was not an absent parent within the meaning of the federal statute. Therefore, it denied aid to an otherwise needy child on the basis that such a substitute parent is not absent from the home.

Mrs. Smith had four minor children (not sired by the "substitute father") who lived with her and who had been receiving aid under the AFDC program for several years. In 1966 they were removed from the eligible list on the ground that a Mr. Williams came to the mother's home on weekends and had sexual relations with her.

Alabama asserted two state interests in support of the regulation: it discouraged illicit sexual relationships and illegitimate births; and it put families in which there is an informal "marital" relationship on a par with those in which there is an ordinary marital relationship, because families of the latter type are not eligible for AFDC assistance. The Su-

preme Court held that since the federal statute had defined the dependent child who was entitled to aid, Alabama's interest in discouraging immorality and illegitimacy was not a legitimate justification for AFDC disqualification because it plainly conflicted with "federal law and policy." It said, among other things:

> In sum, Congress has determined that immorality and illegitimacy should be dealt with through rehabilitative measures rather than measures that punish dependent children, and that protection of such children is the paramount goal of AFDC. In light of the Fleming Ruling and the 1961, 1962, and 1968 amendments to the Social Security Act, it is simply inconceivable, as HEW has recognized, that Alabama is free to discourage immorality and illegitimacy by the device of absolute disqualification of needy children. Alabama may deal with these problems by several different methods under the Social Security Act. But the method it has chosen plainly conflicts with the Act. 392 *U. S.* at 325–327, 88 *S. Ct.* at 2137–2138, 20 *L. Ed.* 2d 1130–1131.

The court went on to declare the regulation invalid because it defined "parent" in a manner inconsistent with the federal statute and thus breached Alabama's federally imposed duty to furnish "aid to families with dependent children * * * with reasonable promptness to all eligible individuals * * *." 392 *U. S.* at 333, 88 *S. Ct.* at 2141, 20 *L. Ed.* 2d at 1134. And it said finally that:

> All responsible governmental agencies in the Nation today recognize the enormity and pervasiveness of social ills caused by poverty. The causes of and cures for poverty are currently the subject of much debate. We hold today only that Congress has made at least this one determination: that destitute children who are legally fatherless cannot be flatly denied federally funded assistance on the transparent fiction that they have a substitute father. 392 *U. S.* at 334, 88 *S. Ct.* at 2142, 20 *L. Ed.* 2d at 1135.

Although the factual situation in *King v. Smith* is different from that before us, the philosophy expressed by the court points the way to the conclusion we deem proper and just with respect to the criminal prosecution here. That case, as well as all of the considerations outlined above,

convinces us that the higher public policy to be served in situations like the one now before us is protection and preservation of the interests of impoverished children, illegitimate and otherwise, in the administration of the welfare program. In seeking that end, it is important that the mother be persuaded to institute proceedings against the putative father and to obtain a court order against him for the future support and education of the illegitimate children. The civil suit is remedial; it puts the obligation of support where it belongs primarily — on the father; and it reduces or eliminates the public welfare financial burden. Moreover, it has the additional advantage of avoiding imposition of the stigma of a criminal conviction on the mother or father or both. At the same time, it brings into being a continuing potential sanction which is more effective than a criminal conviction, *i. e.,* the support order. That order remains operative for many years, at least until the child is emancipated, and violation of its mandate brings the father within the long arm of the contempt process. *McKeany, The Absent Father and Public Policy in the Program of Aid to Dependent Children, supra,* at 54.

Accordingly, we feel that the paramount public purpose in administering the State and local welfare programs as it affects the needs of illegitimate children is served by requiring the mother's cooperation and assistance (and that of the putative father also, if possible) in the filiation and support proceeding. That purpose should not be subverted by fears of the mother or father that the cooperation may result in criminal prosecution for fornication. The Fifth Amendment implications, and primarily the likely deterrence of the mother's application for aid for the innocent children, if the possibility of indictment against either or both of them exists lead us to this conclusion: Whenever the mother of an illegitimate child or children seeks public financial aid for it or them and whether or not bastardy proceedings ensue against the putative father there may be no later prosecution for fornication against either of them.

The approval or disapproval of sexual promiscuity is not involved here. Basically we are concerned with whether needy children should be deprived of public assistance because their mother will not seek it for fear of prosecution for fornication. This means punishment of the children for the immorality of their mother — a result inconsistent with the high purpose of the public welfare program. To inject fear of self-incrimination and to allow it to impede or render impossible accomplishment of the public purpose of caring for destitute children is unwise and socially undesirable. *Cf. State ex rel. Acorman v. Pitner,* 42 *N. J.* 251 (1964) ; *Commonwealth v. Luciano,* 205 *Pa. Super.* 397, 208 *A.* 2d 881 (1965) ; *Rohrheimer v. Winters,* 126 *Pa.* 253, 17 *A.* 606 (Sup. Ct. 1889) ; *Hanes v. Hanes, Tex.,* 234 *S. W.* 1078, 1080 (Tex. Com. App. 1921) ; *Note,* "Federal Judicial Review of State Welfare Practices," 67 *Columb. L. Rev.* 84, 101 (1967).

The judgments of conviction are, therefore, reversed and the matter is remanded for dismissal of the indictment.

*For reversal and remandment*— Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For affirmance*—None.