666 A.2d 1000

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. P.Z., DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 18, 1995—Decided November 13, 1995.

220

Before Judges SHEBELL, WALLACE and NEWMAN.

*Marc E. Roessler,* Assistant County Prosecutor argued the cause for appellant (*Daniel J. Carluccio,* Ocean County Prosecutor, attorney; *Mr. Roessler,* of counsel, and on the brief).

*James Pinchak,* Assistant Deputy Public Defender argued the cause for respondent (*Susan L. Reisner,* Public Defender, attorney; *Mr. Pinchak,* of counsel, and on the brief).

The opinion of the court was delivered by

SHEBELL, P.J.A.D.

The State, on leave granted by this court, appeals from an order of the Law Division that granted the motion of defendant, P.Z., to bar, on constitutional grounds, the use against him in this criminal prosecution of certain statements he gave to a Division of Youth and Family Services (DYFS) case worker. We affirm.

On May 2, 1995 a hearing was held on defendant's motion to suppress his statements. The judge found that the Prosecutor's Office had knowledge of the incident of child abuse from the outset

of the civil matter, when DYFS notified them as required by *N.J.S.A.* 9:6–8.36a. He then went on to state:

> Here's a man who basically has no reason to think, at that point, that he's going to be charged with anything, but we know that the Prosecutor's been involved, at that point, a good long period of time.

> They're looking at this case. And certainly, there's a possibility here that he's a target. And now that—now that the AG and everyone else involved with DYFS knows from the wife that he told [her] he did it, that he shook the child, and so on, and so forth. And they know that they're going to go see him now. They're going *to go see him sans [prosecutor], okay? Sans anybody with a badge. You know,* the question was properly asked, rightly so, by the State.

> ["]You have the power to arrest?["]

> No, but they have a duty, an immediate duty, to call the Prosecutor's Office and let them know precisely what they found, under the circumstances.

The judge found further that the statement made by defendant to the DYFS investigator—"Look, my attorney told me I shouldn't discuss this with you, you know," if made to a "law enforcement officer," in a criminal setting, would be taken by the officer to be an invocation of right to counsel. The judge held that the statement, "under these circumstances, notwithstanding the finding that this was ... not a custodial setting, ... was tantamount to an invocation of his right to counsel ... under the Sixth Amendment." He explained:

> So I think that was a—an invocation of a right to counsel that should have been honored under the facts of this case.

> The subject matter of Title Nine, and ... particularly, as the allegations of this case are applied in Title Nine, though that's a Civil type matter, where right to counsel is called for, the allegations clearly that they were talking about there, if true, could have just as well been handled criminally.

> And Title Nine recognizes that, because they say ... let the Prosecutor know immediately. Keep the Prosecutor informed.

> It's a difficult bridge that we jump back and forth from.

> The Prosecutor is in the case, the Prosecutor is out of the case, not really a Criminal action.

> No Criminal Complaints really filed, but they're there.

> They're—and I don't mean to say this in any type of sinister way, they're hovering, hovering, listening, hearing, talking to the DYFS people. Trying to do their job. Looking to prosecute these people criminally, if that's appropriate.

But I think when they do that, they've got to be held to the standard, which one is held to if a Complaint has, in fact, been filed, and counsel has been appointed.

\*       \*       \*       \*       \*       \*       \*       \*

The facts are that during the fall of 1993, defendant's seven week old daughter, C.Z., was hospitalized with injuries sustained from "Shaken Baby Syndrome." Shortly thereafter, a Title Nine action was brought against the defendant and his wife as parents of C.Z., by the Attorney General on behalf of DYFS. Defendant was represented by a public defender, as provided for by *N.J.S.A.* 9:6–8.43. The Family Part judge entered an order, essentially retaining legal custody in DYFS of the parents' two minor children, C.Z. and M.Z., ordering defendant to undergo drug testing and psychological testing; and ordering defendant and his wife to participate in various counseling and parent training. The order further granted physical custody of M.Z. to defendant's father, who was to reside in defendant's home. Defendant and his wife, however, were ordered to reside with defendant's mother-in-law, and were to have no unsupervised contact with M.Z. Physical custody of C.Z. remained with DYFS, as she was hospitalized at the time.

Concerned about the parents' denial of any problems or of responsibility for C.Z.'s injuries, and because of the imminent release of C.Z. from the hospital and the concerns of placing her with either her grandfather or a foster family, the DYFS worker who had been assigned the case after DYFS took custody of the children held a conference on the case. The conference was attended by the worker's supervisor, the District Office Manager, a Case Office Worker, the Litigation Specialist (a liaison between the Attorney General and DYFS), and a Deputy Attorney General. Due to new information, a statement made by defendant's wife that defendant had admitted to her that he shook the baby, it was decided that the worker should investigate further.

Prior to contacting the defendant, the worker called the Prosecutor's Office to inform them of her intention to investigate the defendant so as not to impede any ongoing investigation that the

Prosecutor's Office may have had going on. She spoke with an investigator who told her that "[b]ecause [defendant] has a lawyer, they cannot interview him, but said that there is no obstacle to the Division [DYFS] interviewing him, and asked that I call [the assigned investigator] with my findings."

On that same day, April 5, 1994, at about 2 pm, two DYFS workers went to defendant's home on an unannounced visit. The two DYFS workers were greeted by defendant's father and allowed into the home. It was explained to the defendant that as a result of the information made known by defendant's wife, they were there to ask defendant about the statement. Defendant indicated that he had spoken to his lawyer and that he should not speak. The DYFS worker testified that she "encouraged" defendant to speak with her because she was there to finish the Division's investigation regarding the matter of C.Z.'s injuries, to deal with the "crisis" at hand—C.Z.'s imminent discharge and where she would be going, and to address new concerns over M.Z.'s safety as a result of the new information.

According to the worker, defendant became quiet, withdrawn, and then began to talk to her about the situation. He became very upset, very tearful, and admitted that he had caused the injuries by shaking C.Z. about 2 or 3 times. Defendant told her that he did not think it was that hard, and that he felt bad about it and deserved to be punished.

Defendant testified that when he made those statements, the foremost thing on his mind was getting his children back and that someone had advised him that things would move a lot faster and, they would get the children back if one of them would confess, whether or not they had inflicted the injuries. He testified that he attached no legal consequences to the statements other than in the context of getting his children back. Defendant testified that he felt compelled to give DYFS a statement—"[I]f I didn't say anything, then the kids wouldn't come home." Defendant recalled telling the worker that he felt relieved over telling her, because he thought that this would mean his children were coming home. On

September 28, 1994, defendant was indicted by an Ocean County grand jury, for two crimes of the second degree: endangering the welfare of a child (*N.J.S.A.* 2C:24–4a), and aggravated assault (*N.J.S.A.* 2C:12–1b(1)).

The State argues on appeal that: 1) the trial court erroneously applied the Sixth Amendment because the defendant's right to counsel had not applied at the time of the confession, and 2) the trial court erred in holding that the DYFS workers were acting in a law enforcement capacity.

The purpose of a Title Nine action is to provide for the protection of children under eighteen who have had serious injury inflicted upon them by other than accidental means, and to assure that innocent children are immediately safeguarded from further injury and possible death, and that their legal rights are protected. *See N.J.S.A.* 9:6–8.8. It is with these purposes in mind that we must approach the present case and the difficult issues it presents.

The Sixth Amendment of the United States Constitution provides that: "In all criminal prosecutions, the accused shall enjoy the right to ... have the Assistance of Counsel for his defence." *U.S. Const.* Amend. VI. New Jersey's analogous constitutional provision Article I, paragraph 10 also provides that: "In all criminal prosecutions the accused shall have the right to ... have the assistance of counsel in his defense." The Sixth Amendment safeguards the "fundamental rights of life and liberty" and ensures proper representation of an accused at trial. *State v. Sanchez,* 129 *N.J.* 261, 265, 609 *A.*2d 400 (1991) (quoting *Johnson v. Zerbst,* 304 *U.S.* 458, 462, 58 *S.Ct.* 1019, 1022, 82 *L.Ed.* 1461, 1465 (1938)). The right extends further, however, to include pretrial stages, at points of time at or after the initiation of "adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois,* 406 *U.S.* 682, 689, 92 *S.Ct.* 1877, 1882, 32 *L.Ed.*2d 411, 417 (1972). In fact, "to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself." *Maine v. Moulton,*

474 *U.S.* 159, 170, 106 *S.Ct.* 477, 484, 88 *L.Ed.*2d 481, 492 (1985). The Court in *Michigan v. Jackson*, 475 *U.S.* 625, 632, 106 *S.Ct.* 1404, 1409, 89 *L.Ed.*2d 631, 639–40 (1986), stated that:

> After a formal accusation has been made—and a person who had previously been just a 'suspect' has become an 'accused' within the meaning of the Sixth Amendment—the constitutional right to the assistance of counsel is of such importance that the police may no longer employ techniques for eliciting information from an uncounseled defendant that might have been entirely proper at an earlier stage of their investigation.

■ New Jersey has traditionally accorded greater protection of the right to counsel than the United States. *State v. Sanchez, supra,* 129 *N.J.* at 274–76, 609 *A.2d* 400.

> [When the] spotlight is on the accused[,] [u]nder those circumstances, the perfunctory recitation of the right to counsel and to remain silent may not provide the defendant with sufficient information to make a knowing and intelligent waiver. . . . Such a recitation does not tell the defendant the nature of the charges, the dangers of self-representation, or the steps counsel might take to protect the defendant's interest. . . . Given the adversarial nature of their relationship, for the State's representatives to communicate adequately that information to an indicted defendant would be difficult, nigh to impossible.
>
> [*Id.* at 276–77, 609 *A.2d* 400.]

However, in *State v. Tucker,* 137 *N.J.* 259, 290, 645 *A.2d* 111 (1994), our Supreme Court declined to extend *Sanchez* to a first court appearance, prior to indictment.

■ Thus, the State urges that we reverse the order suppressing the statements made by defendant to the DYFS investigator as *Tucker, supra,* holds that a defendant's right to counsel attaches upon the return of an indictment, unless invoked at a first appearance. The State points out that *Kirby, supra,* requires that adverse "criminal" proceedings be instituted in order for the right to counsel to attach, and that because the proceedings in the Title Nine action were civil, defendant did not have that right at the time he gave the confession.

The State further argues that even though defendant had an attorney in the Title Nine action, the right to counsel did not attach in the criminal matter. To support this proposition, the State relies upon several federal cases which hold that interrogation on a crime unrelated to the charged offense is not a violation

of the right to counsel even where the police are aware of the presence of an attorney for the charged offense. *See, e.g., United States v. DeVillio,* 983 *F.*2d 1185 (2nd Cir.1993); *United States v. Ryans,* 903 *F.*2d 731 (10th Cir.1990).

We reject the State's position on this issue. The Title Nine case, although a civil matter, had very serious personal consequences to all parties involved, including the defendant. In addition, there was at least some coercive element in the environment of the situation confronting defendant. At the time of interrogation, the Title Nine action had already been instituted and counsel had been appointed for and represented defendant in that action. The State was defendant's adversary in that action, as well as during the time when the statement in question was taken.

Title Nine, Section Eight establishes the jurisdictions of the Family Part and the Criminal Part. In all matters having to do with the noncriminal aspects of a matter, the Family Part has original jurisdiction. *N.J.S.A.* 9:6-8.24. The statute directs that the Family Part shall, immediately upon receipt of a complaint, forward a copy of the complaint to the county prosecutor, after which the prosecutor shall take whatever action he or she deems necessary under all of the circumstances. *N.J.S.A.* 9:6-8.25(a). Likewise, the Prosecutor's Office is to turn cases it originates over to the Family Court, and all criminal complaints amounting to child abuse must be reported to DYFS by the police or prosecutor. *N.J.S.A.* 9:6-8.25(b). Once a complaint is filed, DYFS *must* inform the prosecutor of suspected child abuse. *N.J.S.A.* 9:6-8.36a. Thus, parallel civil and criminal systems are both operating against a defendant at the inception of proceedings in either court.

It is significant that under Title Nine, upon suspicion and prior to the filing of a complaint in the Family Part, DYFS is authorized to investigate situations and schedule preliminary conferences with complainants and potential respondents. *N.J.S.A.* 9:6-8.35. However, Title Nine precludes any statements made during the course of such preliminary conference from being used against a

defendant in a criminal proceeding at any time prior to sentencing. *N.J.S.A.* 9:6–8.36.

> No statement made by the potential respondent during a preliminary conference held pursuant to section 15 hereof may be admitted into evidence at a fact-finding hearing under this act or in a court of criminal jurisdiction at any time prior to conviction.

> *[Ibid.]*

We believe that the Legislature recognized the fundamental injustice that might result from the use of self-incriminatory statements made to DYFS agents where criminal consequences are likely, as well as that the purposes of Title Nine are furthered by the protection provided under *N.J.S.A.* 9:6–8.36. Therefore, despite the fact that many Title Nine actions are filed before any adverse criminal judicial proceedings have begun, the Legislature saw fit to preclude statements made to DYFS investigators from later being used in criminal proceedings. As we indicated, the clear purpose of the Title Nine proceeding of protecting the abused child is a prime consideration. DYFS investigations will undoubtedly be more productive in revealing potential dangers to children, thereby permitting remedial action, if the fear of having one's own statement used in a criminal prosecution is abated. *Cf. People v. Smith,* 62 N.Y.2d 306, 476 N.Y.S.2d 797, 465 *N.E.*2d 336 (1984). We perceive that in such a climate, DYFS workers will be better able to pursue their own legitimate investigation aimed at protecting the child. If the statements they receive are not admissible in a criminal prosecution, they need not jeopardize their own investigation out of concern for the suspect's rights by giving *Miranda* warnings or honoring a prospective defendant's right to counsel. *See* partial dissent, *State v. Helewa,* 223 *N.J.Super.* 40, 54, 537 *A.*2d 1328 (App.Div.1988); *cf. see State v. Flower,* 224 *N.J.Super.* 90, 539 *A.*2d 1223 (App.Div.1988).

■ In *Helewa, supra,* we held that the "close working relationship between DYFS and the law enforcement agencies in cases of child abuse" "changes the status of the social worker to one of a law enforcement officer" in the context of *Miranda. Helewa, supra,* 223 *N.J.Super.* at 47–48, 537 A.2d 1328. We now hold that

based on fundamental fairness and to further the Title Nine objective of child protection by promoting disclosures and admissions of abuse at the earliest possible time, statements to DYFS during the pendency of the Title Nine investigation may not be used against a party in a criminal action unless there is advice of *Miranda* rights and the affording of the Sixth Amendment right to counsel.

Although there is a paucity of case law to support our present holding, in *State v. Clark,* 58 *N.J.* 72, 275 *A.2d* 137 (1971), our Supreme Court in analogous circumstances held that statements made to welfare agents in a bastardy proceeding by the mother of two out-of-wedlock children could not be used against her in a fornication prosecution. 58 *N.J.* at 72, 275 *A.2d* 137. The woman was instructed by the local welfare department to bring a "bastardy" action against the father. In so doing, both she and the father admitted to a number of instances of sexual intercourse. *Ibid.* They were not warned that charges could be brought against them based upon their unwed sexual relations, which were prohibited by the criminal law. *Id.* at 80, 275 *A.2d* 137.

Although adverse "criminal" proceedings had not been instituted and the mother and father were not in custody, our Supreme Court held that the statements made were not admissible in the criminal trial for fornication because of "Fifth Amendment implications involved, in association with strong considerations of public policy." *Id.* at 83, 275 *A.2d* 137. The Court also stated:

[I]f the information she gives (as well as that of the unwarned putative father who acknowledges paternity during the investigation or at the trial of the bastardy case) may be later used as a basis for indictment for fornication against her or both of them, what may be expected as the probable result? The strong probability is that such criminal prosecution will have a "chilling" effect on applications for aid for impoverished out of wedlock children. The likelihood is that mothers will forego such relief rather than incur the risk of a criminal trial, conviction and possible imprisonment of herself and her paramour.

[*Id.* at 87, 275 *A.2d* 137.]

In fact, although there was a direct benefit to be lost by not cooperating with the welfare agency, the Court noted that since the charges had been filed against these defendants, the prosecu-

tor admitted that "there had been a falling off in the number of applications by mothers of illegitimate children for relief." *Ibid.*

> If the threat of criminal prosecution results in the mother withholding her plea for welfare aid, who are the sufferers? Obviously the innocent children who are punished for the moral laxity of their parents. Thus society forces a continuance of their impoverishment upon them in order to make possible imposition of criminal sanctions upon their erring mothers and fathers.
>
> [*Ibid.*]

So too are we convinced that the threat of criminal prosecution will result in parents not cooperating with DYFS investigations, and therefore, fewer children receiving the protection that Title Nine demands, and possibly being forced to continue suffering in an abusive environment.

In this case, although defendant was not in a custodial situation and no adverse judicial criminal proceedings had begun, we are convinced that given the unique circumstances defendant was placed in, his statements must be prohibited from use in the subsequent criminal trial.

Affirmed.