701 A.2d 468

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
DAVID T. COMPTON, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted January 21, 1997—Decided October 8, 1997.

478

Before Judges HAVEY, KESTIN and EICHEN.

*Susan L. Reisner*, Public Defender, attorney for appellant (*Thomas J. Largey*, Designated Counsel, on the brief).

*Peter Verniero*, Attorney General, attorney for respondent (*Wendy Alice Way*, Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

KESTIN, J.A.D.

Defendant was charged with the murder of his four-and-one-half-month-old son, Ronald, and with second degree endangering the welfare of the child. He was convicted of lesser-included first degree aggravated manslaughter and of endangering as charged. After defendant's motion for a judgment of acquittal pursuant to *R.* 3:18-2 was denied, he was sentenced to the presumptive twenty-year term for the manslaughter conviction, *N.J.S.A.*

2C:44–1f(1)(a), along with a concurrent presumptive term of seven years for the endangering conviction, *N.J.S.A.* 2C:44–1f(1)(c).

On appeal, defendant raises the following issues:

*POINT I* THE COURT ERRED WHEN IT ADMITTED "OTHER CRIMES" EVIDENCE & THEREBY CAUSED THE DEFENDANT TO SUFFER UNDUE PREJUDICE AND UNJUST CONVICTIONS.

*POINT II* THE COURT'S LIMITING INSTRUCTION RELATING TO THE INTRODUCTION OF "OTHER CRIMES" EVIDENCE WAS PLAIN ERROR BY FAILING TO PREVENT THE JURY FROM USING THAT EVIDENCE FOR AN IMPROPER PURPOSE—PROOF OF DEFENDANT'S DISPOSITION TO COMMIT THE OFFENSE HE WAS TRIED FOR. (NOT RAISED BELOW).

SUBPOINT (A) THE COURT'S LIMITING INSTRUCTION REGARDING "OTHER CRIMES" WAS NOT SUFFICIENTLY SPECIFIC & THEREBY FAILED TO PREVENT THE JURY FROM CONCLUDING THAT THE DEFENDANT WAS DISPOSED TO COMMIT THE OFFENSES HE WAS CHARGED WITH. (NOT RAISED BELOW).

SUBPOINT (B) THE COURT ERRED WHEN IT FAILED TO PROVIDE LIMITING INSTRUCTIONS AT THE TIME THE PERTINENT EVIDENCE WAS ADMITTED AT TRIAL. (NOT RAISED BELOW).

*POINT III* IT WAS PLAIN ERROR FOR THE COURT TO ADMIT TESTIMONY THAT CAUSED THE DEFENDANT UNDUE PREJUDICE & PREVENTED HIM FROM RECEIVING A FAIR TRIAL & RESULTED IN A MANIFEST INJUSTICE—HIS UNWARRANTED CONVICTION OF AGGRAVATED MANSLAUGHTER AND ENDANGERING THE WELFARE OF A CHILD. (NOT RAISED BELOW).

SUBPOINT (A) THE COURT ERRED WHEN IT ADMITTED EXPERT TESTIMONY FROM DR. SINQUEE ON THE SHAKEN BABY SYNDROME. (NOT RAISED BELOW).

SUBPOINT (B) DR. SINQUEE WAS NOT PROPERLY QUALIFIED BY THE COURT TO OFFER HER PURPORTED EXPERT OPINION ON THE SHAKEN BABY SYNDROME—WHICH CAUSED DEFENDANT'S UNJUST CONVICTION. (NOT RAISED BELOW).

SUBPOINT (C) THE COURT ERRED WHEN IT ALLOWED DR. SINQUEE TO OFFER HER PURPORTED EXPERT OPINION ON THE SHAKEN BABY SYNDROME WITHOUT HAVING FIRST ESTABLISHED ITS GENERAL ACCEPTANCE WITHIN THE SCIENTIFIC COMMUNITY & ITS RELIABILITY. (NOT RAISED BELOW).

SUBPOINT (D) THE COURT ERRED WHEN IT ALLOWED TWO EXPERTS TO OFFER OPINIONS THAT INCLUDED BOTH DIRECT & IMPLICIT DETERMINATIONS OF THE DEFENDANT'S GUILT. (PARTIALLY RAISED BELOW).

*POINT IV* [Withdrawn by motion granted.]

POINT V DEFENDANT WAS DENIED DUE PROCESS & EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE *U.S. CONST.* AMENDS. VI AND XIX [sic] AND BY THE *N.J. CONST.* ART 1, PARA. 10 AND PARA. 1 (NOT RAISED BELOW). [PARTIALLY WITHDRAWN AS RELATING TO POINT IV.]

POINT VI THE COURT ERRED WHEN IT DENIED DEFENDANT'S *R.* 3:18–2 MOTION SINCE THE JURY'S VERDICTS THAT FOUND THE DEFENDANT NOT GUILTY OF RECKLESS MANSLAUGHTER BUT GUILTY OF AGGRAVATED MANSLAUGHTER WERE INCONSISTENT AND UNCONSTITUTIONAL.

POINT VII THE COURT IMPOSED SENTENCES THAT DID NOT COMPLY WITH THE GUIDELINES AND WERE BOTH EXCESSIVE & SHOCKING TO THE JUDICIAL CONSCIENCE.

SUBPOINT (A) THE COURT FAILED TO COMPLY WITH THE SENTENCING GUIDELINES WHEN IT DID NOT SPECIFICALLY & INDIVIDUALLY BALANCE & CORRELATE ITS FINDINGS OF SENTENCING FACTORS TO THE SEVERITY OF THE OFFENSES DEFENDANT STOOD CONVICTED OF.

SUBPOINT (B) THE COURT'S FINDING THAT THE AGGRAVATING FACTORS OUTWEIGHED THE MITIGATING FACTORS WAS PATENTLY ERRONEOUS & WAS ALSO APPARENTLY CONTRADICTED BY ITS OWN OBSERVATIONS.

SUBPOINT (C) THE COURT IMPROPERLY CONSIDERED THE STATUTORY ELEMENT OF "HARM TO THE VICTIM" AS AN AGGRAVATING SENTENCING FACTOR.

SUBPOINT (D) THE COURT ABUSED ITS DISCRETION WHEN IT FAILED TO FIND MITIGATING FACTORS *N.J.S.A.* 2C:44–1b(1), (4) & (9).

SUBPOINT (E) THE COURT'S IMPOSITION OF A TERM OF 20 YEARS IMPRISONMENT FOR AGGRAVATED MANSLAUGHTER & A TERM OF 7 YEARS IMPRISONMENT FOR ENDANGERING THE WELFARE OF A CHILD WAS NOT ONLY EXCESSIVE BUT WAS ALSO SHOCKING TO THE JUDICIAL CONSCIENCE.

Ronald died from injuries incurred while he was in defendant's sole care. When the infant's mother, defendant's wife, left Ronald in defendant's care while she ran some errands, the child was in normal condition. Shortly after she returned home, defendant left. Mrs. Compton heard a noise from Ronald and attempted to pick him up. He was limp and "[h]is eyes were in the back of his head." She called 911. A police officer who arrived with the ambulance noticed that "the child was making squealing noises and twitching his arms and his hands, and feet. I took his blood pressure and pulse, and I found them to be low."

Ronald was taken to one hospital and, within hours, was transferred to another with a pediatric intensive care unit. After tests were conducted, the treating physician, Dr. Sinquee, diagnosed Shaken Baby Syndrome. Following four days of extensive treatment, brain death was established and life support was halted.

Dr. Sinquee, testifying at trial as an expert witness offered by the State, gave details of the brain injuries she diagnosed as Shaken Baby Syndrome which, in her opinion, had caused Ronald's death. A forensic pathologist employed by the State Medical Examiner's Office testified, also as an expert witness for the State, that he had performed an autopsy on the child and had concluded that the cause of death was "traumatic internal hemorrhages" in the brain from an external force or forces. He disagreed that shaking had been the cause of those injuries, however.

Evidence was received over defendant's objection that, on three previous occasions, Ronald had sustained injuries when left in defendant's care. The trial court ruled that the evidence was probative and relevant with respect to the issue of whether the child's death had been accidental, and was, therefore, permissibly part of the State's effort to rebut defendant's claim of accident. There was also evidence from Mrs. Compton and two detectives, all of whom had participated in telephone conversations with defendant in which he admitted that he had squeezed and shaken Ronald on a number of occasions, including on the day in question. After defendant was in custody, he told his wife during a jail visit that, on the day at issue, he had thrown Ronald up in the air; that the infant went through his hands and he dropped the child. Defendant claimed that Ronald looked as if he had passed out, and that he shook the infant in an attempt to revive him.

■ The trial court's ruling admitting the evidence of prior occurrences of harm to the child while in defendant's care was correct. It was relevant to a material issue, *i.e.*, whether the child's death was accidental as claimed by defendant, and it met the other standards governing admissibility under *N.J.R.E.* 404(b). *State v. Cofield,* 127 *N.J.* 328, 337–39, 605 *A.*2d 230 (1992); *State v.*

*Moorman,* 286 *N.J.Super.* 648, 660–63, 670 *A.*2d 81 (App.Div. 1996).

The remaining issues before us bearing upon the conduct of the trial and rulings made therein were not raised during trial. They are, therefore, subject to *R.* 2:10–2. We dispose of them without reference to plain error considerations, however.

We regard the trial judge's limiting instruction in the general charge to the jury, relating to defendant's prior conduct with the infant victim, to have been adequate. Although it would have been better to have given that instruction when the evidence was first offered, as well as in the general charge, *State v. Johnson,* 65 *N.J.* 388, 394, 323 *A.*2d 450 (1974) (Pashman, J., concurring), the omission to do so was not prejudicial. *State v. Hummel,* 132 *N.J.Super.* 412, 424, 334 *A.*2d 52 (App.Div.), *certif. denied,* 67 *N.J.* 102, 335 *A.*2d 54 (1975). Juries have a responsibility faithfully to follow the judge's instructions whenever given, and we presume that they discharge that duty. *State v. Manley,* 54 *N.J.* 259, 270, 255 *A.*2d 193 (1969).

It is also clear that the trial court committed no error in admitting Dr. Sinquee's testimony on Shaken Baby Syndrome. Defendant argues that, with the factual testimony of Mrs. Compton and others concerning the events surrounding Ronald's death, and the expert testimony of the pathologist that the death was caused by "traumatic internal hemorrhages," additional expert testimony from Dr. Sinquee that Shaken Baby Syndrome was the cause of death, was surplusage and, because unnecessary, was unduly prejudicial. Defendant also contends that Dr. Sinquee was not qualified to offer an expert opinion on Shaken Baby Syndrome, and that no adequate foundation had been established for the reliability of her observations and conclusions. Defendant argues further that the general acceptance of Shaken Baby Syndrome within the scientific community, and its reliability as an explanation for the death of the victim, had not been established.

■ With respect to the first of these related arguments, we note only that the State was in no way limited from offering evidence of alternative causes of death reflecting its investigations and meeting the explanations advanced by defendant for the injuries that caused the victim's death. *See State v. Moorman*, *supra*, 286 *N.J.Super.* at 660, 670 *A.*2d 81. We are aware of no rule that requires the State to choose a single theory upon which to build its case. *See, e.g., State v. Cooper*, 151 *N.J.* 326, 341–42, 700 A.2d 306 (1997); *cf. State v. Martin*, 119 *N.J.* 2, 16–17, 573 A.2d 1359 (1990).

■ Secondly, Dr. Sinquee's credentials as a physician who was board certified in pediatrics and pediatric critical care, and who served as Director of the Pediatric Intensive Care Unit at United Hospital, along with the details provided, clearly qualified her as an expert in pediatric intensive care. Her training and experience clearly qualified her to testify concerning infants with traumatically induced brain injuries and the potential causes thereof, including Shaken Baby Syndrome. Furthermore, the nature of the injuries she diagnosed and treated, and the manner in which they are typically induced, bore directly upon the issues in the case and were beyond the ken of the average juror. Thus, two of the three standard requirements for admission of expert testimony were satisfied. *See Nesmith v. Walsh Trucking Co.*, 123 *N.J.* 547, 548, 589 A.2d 596 (1991); *State v. Kelly*, 97 *N.J.* 178, 208, 478 A.2d 364 (1984).

■ The third criterion, "that the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable," *ibid.*, was also not addressed at trial for want of an objection from defendant on that ground. We are satisfied as a *post hoc* matter, however, that this standard, too, was met.

There are three methods for establishing the general acceptance and reliability of a new field of research, including medical conditions and diagnoses, not previously judicially recognized. These approaches were definitively described in *State v. Kelly:*

(1) by expert testimony as to the general acceptance, among those in the profession, of the premises on which the proffered expert witness based his or her analysis; (2) by authoritative scientific and legal writings indicating that the scientific community accepts the premises underlying the proffered testimony; and (3) by judicial opinions that indicate the expert's premises have gained general acceptance.

[*Id.*, 97 *N.J.* at 210, 478 *A.*2d 364.]

*See also State v. J.Q.*, 130 *N.J.* 554, 571–74, 617 *A.*2d 1196 (1993). All three means are available here to qualify Shaken Baby Syndrome as a fitting subject for expert testimony.

Dr. Sinquee's own testimony on the issue of general acceptance was sufficient under the first approach. Although not explored as a preliminary matter in her direct testimony, Dr. Sinquee testified on cross-examination that she was familiar with the literature on Shaken Baby Syndrome, and that it was generally accepted both as descriptive of a condition and as a diagnosis.

It is clear, as well, that the condition has been adequately analyzed and recognized in medical research and literature. As Dr. Sinquee testified, Shaken Baby Syndrome was first identified and named by Dr. John Caffey in his seminal article, *The Whiplash Shaken Infant Syndrome: Manual Shaking by the Extremities With Whiplash–Induced Intracranial and Intraocular Bleedings, Linked With Residual Permanent Brain Damage and Mental Retardation*, 54 *Pediatrics* 396 (1974). It is a term used to connote conditions, such as those described in the title, which may typically result from vigorously shaking a young child. Since 1974, the syndrome (also referred to as "whiplash shaken infant syndrome" or "shaken infant syndrome") has been recognized authoritatively in medical journals, *see, e.g.*, Derek A. Bruce and Robert A. Zimmerman, *Shaken Impact Syndrome*, 18 *Pediatric Annals* 482 (1989); Randell Alexander, et al., *Serial Abuse in Children Who Are Shaken*, 144 *American Journal of Diseases of Children* 58 (1990); Luke J. Haseler, et al., *Evidence From Proton Magnetic Resonance Spectroscopy For a Metabolic Cascade of Neuronal Damage in Shaken Baby Syndrome*, 99 *Pediatrics* 4 (1997); *see also* Millard Bass, et al., *Death-scene Investigation in Sudden Infant Death*, 315 *New England Journal of*

*Medicine* 100, 104, 105 (1986) (citing John Caffey, *On the Theory and Practice of Shaking Infants: Its Potential Residual Effects of Permanent Brain Damage and Mental Retardation,* 124 *American Journal of Diseases of Children* 161 (1972)), in related prints, *see, e.g.,* Showers, *Shaken Baby Syndrome, The Problem and a Model for Prevention,* 21 *Children Today* 34 (1992), and in legal literature, *see, e.g.,* Myrna S. Raeder, *Navigating Between Scylla and Charybdis: Ohio's Efforts to Protect Children Without Eviscerating the Rights of Criminal Defendants—Evidentiary Considerations and the Rebirth of Confrontation Clause Analysis in Child Abuse Cases,* 25 *U. Tol. L.Rev.* 43, 140 (1994). We conclude that "there is sufficient, authoritative legal and medical literature to substantiate the conclusion that [Shaken Baby Syndrome] has been widely accepted in the medical community." *State v. Moorman, supra,* 286 *N.J.Super.* at 659, 670 *A.*2d 81.

Finally, "numerous other jurisdictions have accepted [Shaken Baby Syndrome] as a reliable scientific premise." *Ibid.* Explicit judicial recognition has been accorded in at least two states. *See State v. McClary,* 207 *Conn.* 233, 541 *A.*2d 96, 101–03 (1988); *State v. Lopez,* 306 *S.C.* 362, 412 *S.E.*2d 390, 393 (1991); *see also In re Lou R.,* 131 *Misc.*2d 138, 499 *N.Y.S.*2d 846, 848–50 (N.Y.Fam.Ct. 1986); *In re Renae Ebony W.,* 192 *W.Va.* 421, 452 *S.E.*2d 737, 741 (1994). Many more courts, including our own Supreme Court in *State v. Galloway,* 133 *N.J.* 631, 638, 628 *A.*2d 735 (1993), have recognized the condition implicitly, by acknowledging expert testimony describing the syndrome in connection with a particular case at bar, or treating it as an accepted medical condition without further comment. *See Dabbs v. State,* 518 *So.*2d 825, 826–27 (Ala.Crim.App.1987); *In re B.S.,* 697 *So.*2d 914, 916 (Fla.App.2 Dist.1997); *Jones v. State,* 263 *Ga.* 835, 439 *S.E.*2d 645, 647 n. 2 (1994); *State v. Robinson,* 82 *Haw.* 304, 922 *P.*2d 358, 361–62 (1996); *State v. Ojeda,* 119 *Idaho* 862, 810 *P.*2d 1148, 1150–51 (App.1991); *People v. Rader,* 272 *Ill.App.*3d 796, 209 *Ill.Dec.* 330, 332, 651 *N.E.*2d 258, 260, *appeal denied,* 163 *Ill.*2d 579, 212 *Ill.Dec.* 433, 657 *N.E.*2d 634 (1995); *Brown v. State,* 512 *N.E.*2d 173, 176 (Ind.1987); *State v. Weaver,* 554 *N.W.*2d 240, 241–44 (Iowa 1996);

*State v. Altum,* 262 *Kan.* 733, 941 *P.*2d 1348, 1350 (1997); *State v. Discher,* 597 *A.*2d 1336, 1338–39, 1343 (Me.1991); *State v. Olson,* 435 *N.W.*2d 530, 531–32 (Minn.1989); *Monk v. State,* 532 *So.*2d 592, 594–96 (Miss.1988); *State v. Broseman,* 947 *S.W.*2d 520, 524 (Mo.Ct.App.1997); *State v. Andrews,* 274 *Mont.* 292, 907 *P.*2d 967, 968–69 (1995); *State v. Reynolds,* 240 *Neb.* 623, 483 *N.W.*2d 155, 157–58 (1992); *State v. Wojcik,* 238 *Neb.* 863, 472 *N.W.*2d 732, 734 (1991); *State v. Evans,* 134 *N.H.* 378, 594 *A.*2d 154, 156–57 (1991); *State v. Mallar,* 127 *N.H.* 816, 508 *A.*2d 1070, 1071 (1986); *People v. Van Norstrand,* 85 *N.Y.*2d 131, 623 *N.Y.S.*2d 767, 768–69, 647 *N.E.*2d 1275, 1276–77 (1995), *appeal denied after remand,* 89 *N.Y.*2d 947, 655 *N.Y.S.*2d 898, 678 *N.E.*2d 511 (1997); *State v. Burr,* 341 *N.C.* 263, 461 *S.E.*2d 602, 609 (1995), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 1359, 134 *L.Ed.*2d 526 (1996); *In re A.V.,* 554 *N.W.*2d 461, 462–63 (N.D.1996); *State v. Weeks,* 64 *Ohio App.*3d 595, 582 *N.E.*2d 614, 615 (1989); *State v. Pollard,* 132 *Or.App.* 538, 888 *P.*2d 1054, 1056, *review denied,* 321 *Or.* 138, 894 *P.*2d 469 (1995); *State v. Olsen,* 680 *A.*2d 107, 109 (Vt.1996); *West Virginia ex rel. Wright v. Doris S.,* 197 *W.Va.* 489, 475 *S.E.*2d 865, 870, 875–76 (1996); *State v. Rundle,* 176 *Wis.*2d 985, 500 *N.W.*2d 916, 918 (1993). *Cf. State v. P.Z.,* 285 *N.J.Super.* 219, 223, 666 *A.*2d 1000 (App.Div.1995), *rev'd on other grounds,* —— *N.J.* —— (1997).

All three methods for establishing the general acceptability of Shaken Baby Syndrome as a subject of scientific evidence have been well utilized. *State v. Kelly, supra,* 97 *N.J.* at 210, 478 *A.*2d 364. Thus, we conclude that the trial court committed no error in admitting Dr. Sinquee's testimony concerning the condition and its bearing upon this case.

Defendant's argument that he was denied effective assistance of counsel, *Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984); *United States v. Cronic,* 466 *U.S.* 648, 104 *S.Ct.* 2039, 80 *L.Ed.*2d 657 (1984); *State v. Fritz,* 105 *N.J.* 42, 519 *A.*2d 336 (1987), is based primarily upon the failure of trial counsel to object or raise questions in respect of the foregoing issues, thereby relegating them to plain error grounds on appeal. We

have considered each such issue fully, however, without plain error constraints, and have determined the trial court to have been correct in every instance. It follows that no actual prejudice befell defendant as a result of trial counsel's "omissions." Therefore, the second requirement of the two-part test of *Strickland, supra,* 466 *U.S.* at 687, 104 *S.Ct.* at 2064, 80 *L. Ed.*2d at 693, adopted in *Fritz, supra,* 105 *N.J.* at 58, 519 *A.*2d 336, "that the deficient performance prejudiced the defense," *id.* at 52, 519 *A.*2d 336, has not been met. To the extent there may be any *Strickland/Cronic/Fritz*-type merit to defendant's additional contention that trial counsel was deficient in failing to call an expert witness to rebut Dr. Sinquee's testimony concerning Shaken Baby Syndrome, we leave that issue to fuller development in a proceeding for post-conviction relief. *See State v. Preciose,* 129 *N.J.* 451, 460, 609 *A.*2d 1280 (1992).

■ Defendant argues that an inherent inconsistency between the jury's verdicts of not guilty with respect to reckless manslaughter and guilty with respect to aggravated manslaughter invalidated the verdict. That argument is entirely without merit. *R.* 2:11–3(e)(2). The trial judge was correct to conclude that the jury verdict was entitled to deference because there had been sufficient evidence to prove each and every element of aggravated manslaughter beyond a reasonable doubt. *State v. Kluber,* 130 *N.J.Super.* 336, 341–42, 327 *A.*2d 232 (App.Div.1974), *certif. denied,* 67 *N.J.* 72, 335 *A.*2d 25 (1975). The trial court's reliance on *State v. Myers,* 239 *N.J.Super.* 158, 170–71, 570 *A.*2d 1260 (App. Div.), *certif. denied,* 127 *N.J.* 323, 604 *A.*2d 598 (1990), in denying defendant's *R.* 3:18–2 motion for a judgment of acquittal notwithstanding the verdict was, accordingly, likewise correct.

■ None of the issues defendant raises respecting the sentence have merit, either. *R.* 2:11–3(e)(2). The balancing of aggravating and mitigating factors was appropriate, *State v. Sainz,* 107 *N.J.* 283, 288–91, 526 *A.*2d 1015 (1987); and the concurrent, presumptive sentences were well within the trial court's discretion to impose. *State v. Ghertler,* 114 *N.J.* 383, 387–

88, 555 *A*.2d 553 (1989); *State v. Roth,* 95 *N.J.* 334, 359, 471 *A*.2d 370 (1984). *See also State v. Miller,* 108 *N.J.* 112, 527 *A*.2d 1362 (1987); *State v. Still,* 257 *N.J.Super.* 255, 259, 608 *A*.2d 404 (App.Div.1992).

Affirmed.