**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5308-14T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

T.R.G.,

    Defendant-Appellant.

_____

Submitted September 14, 2017 — Decided November 17, 2017

Before Judges Alvarez, Nugent, and Geiger

On appeal from Superior Court of New Jersey,
Law Division, Camden County, Indictment No.
13-01-0003.

Joseph E. Krakora, Public Defender, attorney
for appellant (Jay L. Wilensky, Assistant
Deputy Public Defender, of counsel and on the
brief).

Mary Eva Colalillo, Camden County Prosecutor,
attorney for respondent (Maura G. Murphy,
Assistant Prosecutor, of counsel and on the
brief).

PER CURIAM

    Tried by a jury, defendant T.R.G. was convicted of sexual

crimes against his step-granddaughters. On March 23, 2015, the

judge imposed an aggregate sentence of sixteen years, subject to eighty-five percent parole ineligibility in accord with the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, after denying defendant's motion for a new trial. Defendant appeals, contending that the trial judge's errors and the prosecutor's prejudicial opening and closing statements warrant reversal, and that his sentence was excessive. After consideration of the legal arguments and our review of the record, we affirm.

Defendant was convicted of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1), (count one); two second-degree aggravated assaults, N.J.S.A. 2C:14-2(b), (counts two and three); and three second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a) (counts four, eight, and thirteen). The first three counts charged defendant with conduct involving Ann[1], who was born in 2003. Ann, Ann's sister Barbara, who was born in 2002, and Ann's cousin, Cathy, who was born in 2001, were separately named in each count of child endangering.

The trial judge merged the second-degree sexual assault into the first-degree crime, and sentenced defendant to the NERA sixteen-year term of imprisonment on count one. The judge also imposed seven-year terms on each of the three second-degree

---

[1] To preserve the anonymity of the parties, we do not use their real names.

endangering convictions, to be served concurrent to each other and to the first-degree offense.

The jury acquitted defendant of two counts of first-degree aggravated sexual assault against Barbara and Cathy. After the jury was unable to reach a unanimous verdict, the prosecutor dismissed counts six, seven, ten, eleven, and twelve, which charged second-degree sexual assaults of Barbara and Cathy.

I.

At trial, R.E. (Ted), Ann and Barbara's father and Cathy's uncle, testified that his mother, the children's grandmother, married defendant in 2007. Ted's relationship with defendant was "cool," but changed dramatically in July 2010, when Ann told Ted about defendant's sexual abuse. Ted immediately called his mother, who is a nurse. She instructed him to take the child to the emergency room, which he did later that evening. The following day Martin A. Finkel, M.D., a pediatrician at the Child Abuse Research, Education, and Service Institute, examined the child.

Around the time Ann disclosed the conduct, Ted asked Barbara if defendant had done anything to her. She denied it. As a result of Ann's disclosures, Ted sent his daughters to live with their mother out-of-state. In March 2012, they returned. After their return, he allowed his children to visit his mother's home, but claimed he assumed that defendant would not be present.

In August 2012, Barbara disclosed to her father that she too had been abused by defendant. When he asked Barbara the reason she delayed in telling him, the child said she was frightened. The next day, Ted spoke with Cathy, who also reported that defendant had molested her. Ted asked the girls to write down what had occurred; he did not read the statements because he was afraid he would harm defendant after doing so. Ted denied telling the girls what to write. He admitted destroying some of defendant's property out of anger over the abuse, and calling defendant a "blood sucker" in court. Ted denied influencing the children in any way. He insisted he only told them to tell the truth.

Ted also described at some length the rupture the allegations caused within the family. He acknowledged that before Barbara and Cathy alleged defendant abused them as well, he actually telephoned defendant's first trial attorney about the possibility of dismissing the case for the sake of his relationship with his mother. Ted said that he had wanted to drop the charges, but changed his mind when Barbara and Cathy came forward. On cross-examination, Ted denied talking to defendant's counsel at the courthouse, or that the lawyer told him to speak with the prosecutor about the dismissal.

In 2010, Ann lived with her grandmother and defendant during the week, and on the weekends lived with her father. She was ten at the time of the trial. She testified that on occasions, defendant applied some kind of "grease" inside her body, and afterwards "put his penis inside." He also touched her private parts with his fingers. Defendant would stop if he heard someone come to the door. Ann said "it hurted" when she tried to go to the bathroom, and that "it hurted" during the course of the assault.

The incidents occurred while defendant alone was watching the children, and Barbara and Cathy would be in another room. On one occasion, Ann was asleep when she was assaulted, and recalled that she "felt something and it hurted and then that's when I woke up." When the assaults occurred, defendant's penis was hard. She estimated that the incidents happened approximately five times.

Ann said she also saw defendant touch Barbara when he was with her under the covers on one occasion, shortly after he had touched her. Ann never saw defendant touch Barbara again, and she never saw him touch Cathy.

Ann decided to tell her father about defendant assaulting her after seeing defendant touching her sister, and did so the following day. She had been worried that Ted would be mad at her, but he was not, although he was upset. Ann denied that Ted had

coached her. She told the prosecutor's investigator, who also testified, about what happened and reported pain on urination to her, although no bleeding. She never said anything to her grandmother.

Barbara was twelve at the time of trial. Back in 2010, she was at her grandmother's house frequently, and knew her father and defendant had never gotten along. Barbara remembered defendant touching her inappropriately, but could not recall how many times it occurred. Defendant used some kind of substance during the assaults, which she described as "lotion." She pretended being asleep when defendant placed his penis inside her vagina, and touched her bottom. She said it hurt, and that she had pain on urination afterwards, but did not recall bleeding. She said nothing to her grandmother. Defendant touched Barbara with his penis on more than one occasion, and the second time he penetrated her was similar to the first.

Barbara also reported that defendant liked playing a "tickle game" with her. He would touch her all over her body, including her chest, her bottom, and her private part. Barbara only saw defendant play this game with her and with Cathy. He rubbed Cathy's chest and all over her body, although not her private part. Barbara saw defendant touch Cathy on one occasion while they were all under the covers. All the inappropriate touching

stopped when Ann told. Barbara explained that she said nothing at the time Ann disclosed because she was afraid that defendant "was going to say or going to do something with my grandmom."

When Barbara did disclose to her father, he became angry and instructed her to write down everything that had happened, but did not tell her what to write. When she spoke to the detectives in 2012, she told them the truth.

When Cathy testified at the trial, she was twelve. She said that in 2010, while her grandmother was working, defendant would sometimes watch her and her cousins. She recalled one particular occasion on which defendant began to rub her back, and touched her private part with his hands. He took off her pants and "put his penis inside." Cathy was lying on her back and he was on top of her. She said it "felt weird, and it hurt." It also hurt when she went to the bathroom afterwards on urination, but there was no blood. Defendant never touched her again after that one time other than the tickle game.

Cathy reported defendant played the game with her, Ann, and Barbara. He only played the game when their grandmother was absent, and he told them not to say anything because he would get into trouble. It was not until she was older that she realized there was something wrong about a grown man touching the private areas of children.

On one occasion, Cathy saw Ann go into the bathroom, and defendant follow her in. They were in there for approximately twenty minutes. Ann acted as if nothing had taken place, and afterwards came out and watched a movie with the other children. Defendant did not come back into the room.

When Cathy made her disclosures to Ted, she did so because she felt she might as well tell since everyone else had. Her uncle was the first adult she spoke to and he did not tell her what to say, only that she needed to write down what had happened on paper.

Finkel, qualified as an expert in the field of pediatrics, testified on behalf of the State. He examined Ann on July 23, 2010. She reported pain and discomfort after being touched when she urinated, a condition known as dysuria. The condition can occur for a number of reasons, but Ann experienced the condition only after defendant allegedly molested her. Although actual penetration into the vagina of a prepubescent girl would result in significant genital trauma, he found none in Ann. He did not expect to find such symptoms given the time that had elapsed since the events. Finkel further explained the absence of such trauma as possibly the result of the nature of the penetration, which he had asked Ann to demonstrate on an anatomical model. When no

other explanation for dysuria is present, Finkel opined it results from sexual abuse.

A Camden County Prosecutor's Office detective explained that she became involved with the case after notification from a local hospital. The detective's recorded July 28, 2010 interview with Ann was shown to the jury.

An investigator with the prosecutor's office videotaped interviews with Barbara and Cathy on August 28, 2012; they too were shown to the jury. The medical examination of Barbara and Cathy did not reveal any physical trauma or signs of abuse.

After the State rested, defense counsel informed the court that he intended to call defendant's former attorney regarding his recollection of his conversation with Ted. Accordingly, the court conducted an N.J.R.E. 104 hearing out of the presence of the jury on the admissibility of the proposed testimony.

During the hearing, the attorney said he spoke to Ted in person at the court house on either March 26, 2012, or April 16, 2012, not on the phone. He said that Ted told him "he was having . . . disbelief as to the statements of his daughter, [Ann] he . . . did not believe that the allegations were true." The attorney advised Ted to contact the prosecutor and convey his doubts about Ann's veracity.

On cross-examination, the attorney explained that Ted did not give a specific reason for his "disbelief," just that he did not believe the child's allegations. The conversation occurred before Barbara and Cathy had made their disclosures.

At the close of the hearing, the court found a portion of the testimony to be inadmissible. The judge held that Ted's opinion about the veracity of his daughter's allegations was irrelevant, observing that it was the jury's job to decide whether or not Ann was credible. Furthermore, he considered the statement to be hearsay, highly prejudicial to the State, and excluded by N.J.R.E. 602 as inadmissible lay opinion.

The court agreed the attorney could testify for impeachment purposes, however, and described his recollection that the conversation occurred in person in the courthouse and not on the phone, and that contrary to Ted's testimony, Ted told the attorney that he wanted to resolve the case not because of "family issues," but because of "something" else instead. The attorney could state that he directed Ted to convey the information to the prosecutor. The first attorney's testimony before the jury complied with the limits imposed by the court.

Defendant presented several witnesses, including a character witness and his sister. Defendant's sister testified that his relationship with Ted was poor. The children's grandmother,

10

defendant's wife, also testified, and she described many confrontations over the years between defendant and Ted, beginning between 2004 and 2005, when Ted moved in with her and defendant. The disagreements, including several physical altercations, continued even after her marriage. She recalled that Ted and defendant had an altercation just prior to July 22, 2010, the day that Ann came forward with the allegations against defendant.

Defendant's wife explained that during the relevant time frame, she was the primary caregiver for the children, and that they would confide in her about everything. Despite this close relationship, the children never said anything to her about defendant molesting them. Defendant's wife also said she would not leave the children alone with defendant because they were "too bad — too active for [him]." She mentioned that she and defendant cared for Ted's youngest child, a boy who has special needs. Defendant's wife recalled leaving Ann alone with defendant once in the summer of 2010 so that the child could finish watching a movie before going to a family get-together. When she left, defendant was outside. She further testified that she took a work leave of absence from March 2010 until November 2010, and saw no change in the girls' normal behavior or physical appearance, or anything unusual on their clothes or linens.

Defendant's wife further stated that even after the alleged incidents, the family had gone on trips and vacations together, and acted like a family. Defendant, Ted, and the girls went on at least one of those trips. Ted sent the grandchildren to her house knowing defendant would be present. She denied ever seeing defendant in the bedroom with any of her granddaughters, although she saw him tickling the girls, which he did with all their grandchildren.

Defendant also testified. He categorically denied sexually assaulting his step-granddaughters. He acknowledged seeing them after he was released on bail, although his bail conditions barred contact. Defendant said it had been explained to him that he could not approach the girls, but that if they came to him it was not a violation of his bail. When the prosecutor attempted to cross-examine him regarding post-bail contact with the girls, defendant asserted his Fifth Amendment privilege.

The judge immediately called a recess, and excused the jury to allow defendant's attorney to consult with his client. Once back in the courtroom, counsel advised that defendant did not intend to testify further, and in fact, had left the courthouse and told his attorney on the phone that he would probably be hearing about him in the news. After discussion with counsel, the judge struck defendant's testimony, and told jurors not to consider

it. We more completely describe these events, and the challenged remarks by the prosecutor, in the relevant section.

On appeal, defendant raises the following points:

POINT I

THE TRIAL COURT ERRED TO DEFENDANT'S GREAT PREJUDICE IN PRECLUDING TESTIMONY THAT THE ALLEGED VICTIMS' FATHER/UNCLE HAD STATED THAT HE DID NOT BELIEVE THE ACCUSATIONS AGAINST DEFENDANT. U.S. CONST., AMEND. (1947) [sic] XIV, N.J. CONST. (1947), ART. 1, PAR. 10.

POINT II

THE PROSECUTOR DILUTED THE STATE'S BURDEN OF PROOF BY ARGUING IN SUMMATION THAT THE PRESUMPTION OF INNOCENCE WAS EXTINGUISHED BEFORE DELIBERATIONS, VIOLATING DEFENDANT'S RIGHT TO A FAIR TRIAL. U.S. CONST., AMEND. XIV, N.J. CONST. (1947), ART. 1, PAR. 10. (Not Raised Below).

POINT III

THE STATE, IN ITS OPENING STATEMENT, COMMITTED MISCONDUCT SUFFICIENTLY PREJUDICIAL TO WARRANT REVERSAL. U.S. CONST., AMEND. XIV, N.J. CONST. (1947), ART. 1, PAR. 10. (Not Raised Below).

POINT IV

THE DEFENDANT WAS DENIED HIS DUE-PROCESS RIGHT TO PRESENT HIS DEFENSE WHEN HIS TESTIMONY WAS STRICKEN AFTER HE ASSERTED HIS RIGHT TO SILENCE AND THEN ABSENTED HIMSELF FROM COURT, AND COUNSEL WAS INEFFECTIVE FOR ACQUIESCING IN THE PROCEDURE. U.S. CONST., AMENDS. VI, XIV, N.J. CONST. (1947), ART. 1, PARS. 9, 10. (Not Raised Below).

13

POINT V

THE TRIAL COURT IMPOSED AN EXCESSIVE SENTENCE, NECESSITATING REDUCTION.

I.

Defendant contends the court erred in limiting his first trial attorney's testimony about his conversation with Ted because it was admissible under N.J.R.E. 803(a)(1) as a prior inconsistent statement. We note that the first attorney was permitted to testify as to the fact that the children's father made statements inconsistent with what he said at trial. Thus, the jury had information it could have used to conclude that Ted was not credible. But the judge's limitation properly prevented them from factoring in Ted's opinion on Ann's credibility in making their determination.

Prior inconsistent statements are only admissible under N.J.R.E. 803(a)(1) if admissible while the declarant was testifying. Since only otherwise admissible statements can come in under the rule, this improper opinion testimony had to be redacted from the first attorney's statements. See State v. Pasha, 280 N.J. Super. 265, 270-71 (App. Div.), certif. denied, 142 N.J. 453 (1995). Repeating Ted's statement regarding Ann's truthfulness would have been improper because one witness is not permitted to assess the credibility of another witnesses'

testimony. It would have been "an encroachment upon the province of the jury." State v. Frisby, 174 N.J. 583, 595 (2002) (citation omitted).

Furthermore, a trial court's evidentiary rulings are "entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment." State v. Marrero, 148 N.J. 469, 484 (1997); see also Verdicchio v. Ricca, 179 N.J. 1, 34 (2004) (holding admissibility of evidence falls within the broad discretion of the trial judge). On appellate review, a trial court's evidentiary ruling must be upheld "unless it can be shown that the trial court palpably abused its discretion, that is, that its finding was so wide of the mark that a manifest denial of justice resulted." State v. Carter, 91 N.J. 86, 106 (1982).

It is undisputed that Ted's statement about his belief regarding the truthfulness of Ann's accusation was hearsay as defined within N.J.R.E. 801(c): "'hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is only admissible if permitted on some separate grounds found in the rules of evidence "or by other law." N.J.R.E. 802. But the statement does not fall under any other exception.

Ted had no personal knowledge of whether Ann was actually sexually assaulted by defendant. His belief was not based on his perception. Thus, the opinion he expressed was nothing more than inadmissible lay opinion testimony. See N.J.R.E. 602; N.J.R.E. 701.

The logical leap between defendant's theory that Ted instigated the accusations and his expressed doubt about Ann's statements is not one we are willing to make. To that extent, we agree with the trial judge that his opinion was irrelevant. Certainly we agree with the judge that the statement was inadmissible, albeit for a different reason. See Isko v. Planning Board, 51 N.J. 162, 175 (1968) (an order or judgment will be affirmed on appeal if it is correct, even though the judge gave the wrong reasons for it).

## II.

Defendant also contends that the prosecutor's remarks during summation about the presumption of innocence constituted prosecutorial misconduct which deprived him of a fair trial. We review the claim under the plain error rule, as it was not previously raised. See R. 2:10-2.

The remarks to which defendant now objects are highlighted in the following quote, which includes language immediately preceding and following those statements.

16                                                    A-5308-14T2

You've heard all the elements.  You've heard all the evidence, you've heard all the girls testify.

Again, I stood up here in front of you at the beginning of the trial.  Presume [defendant] innocent.  You hadn't seen any evidence.  You hadn't heard any testimony from any of the witnesses.

I told you throughout the course of the trial, through the presentation of the evidence, through the presentation of witnesses, the State would tear down that presumption. Brick by brick we would tear it down by showing you the girls and their truthful testimony.  By putting [Ted] on the stand.

The State has — by putting [] Finkel on the stand.  The State has done that.  <u>Now, that the case is over</u>, now that you've seen all the evidence, <u>the presumption of innocence is gone</u>.

And the State's proven to you each and every element of each and every offense beyond a reasonable doubt.

Ladies and gentlemen, you go back into the jury room, bring your common sense with you. Bring your ability to assess the credibility of people.  You do it every day in a lot of different situations.

Consider the evidence.  Consider the testimony.  Remember how the girls testified. Remember how they gave those statements when they were six, eight, and nine years old.

If you consider that evidence, and you consider it fairly, and you consider it thoroughly, you'll come back with the only reasonable verdict in this case, and that's guilty beyond a reasonable doubt to each and every element of each and offense [sic].

A–5308–14T2

In considering the weight to be given to this claim, we look first to the judge's instructions to the jury. He instructed that the presumption of innocence carried through deliberations unless and until the jury determined that defendant was guilty.

"Not every instance of misconduct in a prosecutor's summation will require a reversal of a conviction. There must be a palpable impact." State v. Roach, 146 N.J. 208, 219, cert. denied, 519 U.S. 1021, 117 S. Ct. 540, 136 L. Ed. 2d 424 (1996).

It is noteworthy that no objection was made to the now objected-to comments when uttered. See State v. Timmendequas, 161 N.J. 515, 576 (1999), cert. denied, 534 U.S. 858, 122 S. Ct. 136, 151 L. Ed. 2d 89 (2001). The assumption is that the remarks were not considered prejudicial by defense counsel when made, and in this case, that conclusion is inescapable.

In his closing statement, although the prosecutor misspoke regarding the duration of the presumption of innocence, that fleeting reference was unlikely to have prejudiced the outcome. The jury was instructed that statements by the attorneys were not the law, and that only the judge conveyed the law as it applied to the case. The trial court correctly instructed the jury regarding the presumption of innocence and the State's burden of proof.

Defendant's argument, that the judge erred in his final instruction by only tracking the Model Jury Charge and omitting mention of the prosecutor's misstatement of the law, is not persuasive. State v. Compton, 304 N.J. Super. 477, 483 (App. Div. 1997), certif. denied, 153 N.J. 51 (1998). It is presumed that juror's follow a judge's instruction. Ibid. The judge instructed the jury that the presumption of innocence follows defendant into the jury room. Thus, the prosecutor's fleeting remarks, even if a misstatement of the law, were not clearly capable of producing an unjust result, nor so egregious that they deprived defendant of a fair trial. Timmendequas, supra, 161 N.J. at 575.

## III.

Defendant also contends that the prosecutor's opening statement included language that was improper and prejudicial, requiring reversal even under the plain error standard. See R. 2:10-2. The prosecutor described the case as "very, very ugly," and involving "hideous acts performed against the most vulnerable of all victims, children[.]"

Additionally, the prosecutor introduced himself by stating that it was his "job in this case to represent the people of the State of New Jersey[.]" Defendant argues that language was intended to align the prosecutor with the jury, to the exclusion of the defendant. We do not agree as to either claim.

19

The prosecutor's opening remarks, in relevant part, are as follows:

> Good morning, ladies and gentlemen. I know we've been introduced before, but my name is [ ]. I'm [an] Assistant Prosecutor here in Camden County. It's my job in this case to represent the people of the State [of] New Jersey.
>
> . . . .
>
> Now, this case, this is somewhat of a difficult case. That's because it [is] a very, very ugly case. It involves hideous acts performed against the most vulnerable of all victims, children. And that's exactly what this defendant did. He preyed on three little girls, his three step[-]grandchildren, who were six, eight and nine years old at the time that he did it.
>
> I'm not going to sugarcoat this for you, ladies and gentlemen. You're going to hear things that are going to make you uncomfortable. You're going to hear things that may disgust you. Listen to the facts, listen to the evidence.

In their context, the description simply does not appear egregious, or pose the risk of having so inflamed or prejudiced the jury that defendant was deprived of his right to a fair trial. The prosecutor is entitled to describe the facts he or she intends to prove by competent evidence. State v. Wakefield, 190 N.J. 397, 442 (2007), cert. denied, 552 U.S. 1146, 128 S. Ct. 1074, 169 L. Ed. 2d 817 (2008). A prosecutor is permitted to comment on the evidence he intends to present to the jury. Ibid. at 442.

A-5308-14T2

It also bears noting that not only did defense counsel not find the introductory language objectionable, he responded in his opening to the comments the prosecutor had made. He agreed that the alleged crimes were "heinous," -- but that it was important to keep in mind that the State had to prove beyond a reasonable doubt that the offenses occurred, and that sympathy could not play a role in the jury's decision. The prosecutor's description, albeit somewhat hyperbolic, did not "substantially prejudice[] defendant's fundamental right to have a jury fairly evaluate the merits of his defense." Timmendequas, supra, 161 N.J. at 575. Furthermore, in this case, as in every case, the judge instructed the jury regarding the manner in which they were to weigh the evidence before rendering their verdict. He said, tracking the model jury charge:

> As jurors, it's your duty to weigh the evidence calmly, without any passion, prejudice, or sympathy, as any influence caused by these motions [sic] has the potential to deprive both the State and the defendant what you promised them, a fair and impartial trial by fair and impartial jurors.
>
> Also, speculation, conjecture, or any other form of guessing, should play no role in the performance of your duties.
>
> [Model Jury Charge, (Criminal), "Criminal Final Charge" (2014).]

Again, it is presumed that the jury understood and followed the trial judge's instructions.  Manley, supra, 54 N.J. at 271; Compton, supra, 304 N.J. Super. at 483.

Defendant relies on State v. Negron, 355 N.J. Super. 556 (App. Div. 2002) to support his argument that the prosecutor's introduction was improper and prejudicial.[2]  In Negron, the prosecutor stated that he represented "the citizenry of our State." Id. at 576.  He added, however, that he was "alone on behalf of the State[,]" and that he wanted the jurors "to pretend that in that seat next to [him] are all [their] friends, neighbors and relatives in the community because it's on their behalf that [he] bring[s] this case to [the jurors] and as a public servant it's [his] obligation and [his] desire to seek out justice. . . ." Ibid.  These comments were prejudicial because they asked the jury to align themselves with the State to the exclusion of the defendant.  In contrast, in this case, the prosecutor's explanatory introduction was fleeting, arguably factual and thus unobjectionable.  It was not prejudicial.

Thus, we conclude that the prosecutor's remarks in the opening statement were neither clearly capable of producing an unjust

_____

[2] We do not address counsel's reliance on State v. Raiford, No. A-4370-10 (App. Div. Oct. 16, 2013) because it is an unpublished decision.  See R. 1:36-3.

result, nor so egregious that defendant was deprived of a fair trial. <u>Timmendequas</u>, <u>supra</u>, 161 <u>N.J.</u> at 575. Defendant's failure to object only corroborates the conclusion. <u>Id.</u> at 576.

## IV.

Defendant contends he is entitled to a new trial because his testimony was stricken after he claimed the Fifth and left the courthouse. This unfortunate outcome was the product of defendant's own conduct and does not warrant reversal of the conviction.

As a threshold matter, we will not now address defendant's ineffective assistance of counsel claim. His attorney's decisions regarding whether to object to the judge striking the testimony will be deferred to petition for post-conviction relief, should defendant choose to pursue such relief. The record is insufficient for evaluation of the claim. <u>See</u> <u>State v. McDonald</u>, 211 <u>N.J.</u> 4, 30 (2012). Additionally, it is sheer unwarranted speculation to suggest that had the judge allowed the testimony to stand, the trial's outcome would have been different.

Turning to the merits of his argument, during his direct examination, defendant denied abusing his step-granddaughters. The judge called a recess when during cross-examination, the prosecutor attempted to query defendant regarding his contacts with the step-grandchildren despite bail conditions which

prohibited them. Defendant unexpectedly claimed his Fifth Amendment privilege against self-incrimination, and the court excused the jury to allow defense counsel time to confer with his client. The trial court then said to counsel, while defendant was still in the courtroom: "Let [defendant] know that, if he doesn't want to answer questions, I've got to strike his direct[,]" to which defense counsel responded, "I know."

Upon his return, counsel advised the court, "I think he is going to have the testimony stricken, because he's thinking he's going to get locked up." The court advised defense counsel that he was "going to direct [defendant] to testify[,]" and if he refused, it would "cite him in contempt." The court further stated that if defendant continued to refuse to testify, the prosecution could move to strike his testimony. Defense counsel again asked for, and was granted, a second recess to confer with defendant. It is not clear if defendant was in the room during this colloquy.

When defense counsel returned to the courtroom alone after speaking with defendant, he explained:

> [T]the court gave me the opportunity to go out and speak to [defendant] about . . . his exertion of his Fifth Amendment right. And with respect to his testimony, of course, everything that gave rise to this was concerning the no contact as a point of his bail.

24

As a result of that, the discussion went from the Fifth Amendment issue to whether . . . his bail was going to be revoked. And I told him, I don't know. But that's not an issue before the court at this particular point. He asked for some assurances. I told him that I could not give him any assurances to that.

I told him what would happen here is that we would come back into court if you're going to exert your Fifth Amendment right, which I believe he might have waived . . . , so, he wouldn't have to testify.

But certainly you have to answer questions, or if you choose not to, then that's another option . . . we were talking about this.

. . . .

[W]hen I went out this time, [defendant] wasn't out there. So, I called him on the phone. And he advised me that he was not going to be returning. And we would probably hear about him on the news today.

The court and defense counsel then engaged in this dialogue:

THE COURT: What I'm going to do is, . . . I think it's clear at this point, he's voluntarily chosen —

[DEFENSE COUNSEL]: Not to testify.

THE COURT: -- not to be here.

[DEFENSE COUNSEL]: Right.

. . . .

THE COURT: So, clearly at this point, he has waived his right . . . to his Fifth Amendment - -

[DEFENSE COUNSEL]: Right.

25                                          A-5308-14T2

THE COURT: -- by taking the stand, and revoking it at this point.

Based on that information, quite frankly, I would be compelling him to continue to testify.

[DEFENSE COUNSEL]: Right.

THE COURT: Now, if he refuses, then he can be held in contempt of court.

Based on what you're telling — your conversation with your client, he has chosen not to testify, and not to continue.

[DEFENSE COUNSEL]: Correct.

THE COURT: Okay. Therefore, I — I would be compelled to direct that his entire testimony be stricken from the record.

Later in the proceeding, but before striking defendant's testimony, the judge asked defense counsel if defendant's position had changed, to which defense counsel responded that it had not. Defendant concedes that defense counsel did not object to the striking of his testimony. R. 1:7-2. Therefore, this issue is reviewed for plain error, which requires the error to be "of such a nature as to have been clearly capable of producing an unjust result[.]" R. 2:10-2.

"It is well-settled that a defendant who voluntarily takes the stand and offers testimony in his own behalf exposes himself to cross-examination and the possibility of being compelled to

testify against himself." State v. Bogus, 223 N.J. Super. 409, 422 (App. Div.), certif. denied, 111 N.J. 567 (1988); see also Brown v. United States, 356 U.S. 148, 154-56, 78 S. Ct. 622, 626-27 2 L. Ed. 2d 589, 596-97 (1958) ("If [a criminal defendant] takes the stand and testifies in his own defense, his credibility may be impeached and his testimony assailed like that of any other witness, and the breadth of his waiver is determined by the scope of relevant cross-examination. 'He has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts.'") (quoting Fitzpatrick v. United States, 178 U.S. 304, 315, 20 S. Ct. 944, 949, 44 L. Ed. 1078, 1083 (1900)).

"The practical result, therefore, of a defendant's decision to testify is to effect a waiver of his constitutional privilege against self-incrimination, at least to the extent necessary to permit effective cross-examination." Bogus, supra, 223 N.J. Super. at 422. Moreover, when a defendant is called to the stand by his counsel and testifies without objection, "[t]he inference is clear that defendant knowingly, voluntarily and intelligently, with the advice of counsel, waived his right not to testify and took the stand on his own behalf." Id. at 423.

One of the essential purposes of cross-examination is to test the reliability of testimony given on direct-examination. State

v. Branch, 182 N.J. 338, 348 (2005). Generally, direct testimony cannot be deemed reliable unless tested in the "crucible of cross-examination." Ibid. Our courts have recognized "the fundamental unfairness of permitting such testimony to be considered by the trier of fact." State v. Feaster, 184 N.J. 235, 249 (2005). Thus, "[w]hen a witness's direct testimony concerns a matter at the heart of a defendant's case, the court should strike that testimony if the witness relies on the privilege against self-incrimination to prevent cross-examination." Id. at 248.

It is mere speculation for defendant to assert that had he been given the opportunity to understand the court's contempt power, or more explicitly, that his direct testimony would be stricken if he left, that his decision would have changed. Defendant heard the judge's initial comments and knew his testimony would be stricken. Unless counsel was lying to the court, counsel reiterated to defendant once outside the courtroom, the likely outcome of his continued reliance on his Fifth Amendment privilege to remain silent.

Clearly, defendant's direct testimony went to the heart of the matter, as he denied sexually abusing his step-granddaughters. It would not have been reasonable for him to assume that having made those statements, he could leave and avoid cross-examination on the central issue in the case, without any repercussions.

28                                                    A-5308-14T2

Furthermore, defendant acknowledges that had he continued to refuse to subject himself to cross-examination, regardless of the court's contempt power, his direct testimony would ultimately have been legitimately stricken. The argument seems to be that the court should have adjourned the matter, or should have taken other steps to attempt to convince him to testify, on the chance he would continue to testify without asserting the Fifth. An overnight delay in the hopes defendant would change his mind was not necessary — defendant made a decision for which he paid a high price. He knew his testimony would be stricken if he left, and chose to do so.

V.

Finally, defendant objects to his sentence, asserting that the judge's weighing of the aggravating and mitigating factors was not supported by the record, and that it resulted in the imposition of excessive terms of incarceration. He also complains that the court did not take into account the real time consequences of NERA.

Trial courts "are given wide discretion so long as the sentence imposed is within the statutory framework." State v. Dalziel, 182 N.J. 494, 500 (2005). The standard of review is "one of great deference and '[j]udges who exercise discretion and comply with the principles of sentencing remain free from the fear of

29

second guessing.'" Id. at 501 (quoting State v. Megargel, 143 N.J. 484, 494 (1996)) (alteration in original).

"[A] trial court should identify the relevant aggravating [factors of N.J.S.A. 2C:44-1(a)] and mitigating factors [of N.J.S.A. 2C:44-1(b)], determine which factors are supported by a preponderance of the evidence, balance the relevant factors, and explain how it arrives at the appropriate sentence." State v. O'Donnell, 117 N.J. 210, 215 (1989).

"An appellate court should disturb the sentence imposed by the trial court only in situations where the sentencing guidelines were not followed, the aggravating and mitigating factors applied by the trial court are not supported by the evidence, or applying the guidelines renders a particular sentence clearly unreasonable." State v. Roach, 146 N.J. 208, 230 (citing State v. Roth, 95 N.J. 334, 364-65 (1984)), cert. denied, 519 U.S. 1021, 117 S. Ct. 540, 136 L. Ed. 2d 424 (1996).

Defendant's sentence to sixteen years' imprisonment subject to NERA does not shock our conscience. See Roth, supra, 95 N.J. at 363-64.

The court found three aggravating factors, N.J.S.A. 2C:44-1(a)(3), (6), and (9), and two mitigating factors, N.J.S.A. 2C:44-1(b)(7) and (11). The court concluded that the risk of re-offense arose from defendant's prior contacts with the court system, and

the fact the present indictment alleged eight indictable charges involving three different victims. This was sufficient evidence in the record to justify the factor. As to N.J.S.A. 2C:44-1(a)(b), defendant's priors were certainly quite old, from 1988 to 1998. Although we may not agree with the trial judge regarding the appropriateness of the factor based on the age of defendant's prior criminal history, we cannot say that the judge's decision to find that factor was unreasonable or not authorized by law.

Nor do we agree that the great weight the judge gave to N.J.S.A. 2C:44-1(a)(9) was improper. In this case, the victims are children. That factor has great weight not only as to the individual defendant, but to the public as well.

The court was not compelled to explicitly take into account the real time consequences of NERA. NERA is a consideration, among others, that plays a role in a judge's decision to fashion an appropriate sentence. See State v. Hernandez, 208 N.J. 24, 50 (2011) (quoting State v. Marinez, 370 N.J. Super. 49, 58 (App. Div.), certif. denied, 182 N.J. 142 (2004)).

That the judge found mitigating factors no doubt informed his decision to impose concurrent sentences for the offenses committed against the victims. Similarly, it also explains his reduction from the outer limit of the range of twenty years. Overall, the

balancing between aggravating and mitigating factors is unassailable.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION